### KNOTTS v. UNITED STATES.
### No. 50215.

United States Court of Claims.

June 8, 1954.

Saul G. Lichtenberg and Daniel F. Boone, Washington, D. C., for plaintiff.

Martin E. Rendelman, New York City, and S. R. Gamer, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff alleges that she was illegally discharged from her position with the National Labor Relations Board and she sues for the salary of which she was thereby deprived.

The decisions of this court are uniform in holding that it will not review on the merits a removal of a Government employee where it appears that the procedural requirements prescribed by statute have been complied with, and where there is no showing that the action was taken maliciously or in bad faith. But we have also said that if it appears that an employee was discharged, not for the good of the service, but from motives of malice or for any reason other than for the good of the service, the discharge was unlawful and the employee is therefore entitled to recover

the salary he would have earned had he not been illegally dischargd.

We stated the reason for this in Gadsden v. United States, 111 Ct.Cl. 487, 489–490, 78 F.Supp. 126, 127:

"On the other hand, if the administrative officer did not act in good faith, if he in fact did not discharge the employee for a cause that would promote the efficiency of the service, but if, on the other hand, he was motivated alone by malice toward the employee, there would seem to be but little doubt that the employee's rights under the Act of 1912 have been violated. That Act says, that 'no person in the classified civil service of the United States shall be removed therefrom except for such cause as will promote the efficiency of said service.' [5 U.S.C.A. § 652]. If, as a matter of fact, he was removed not for a cause that promoted the efficiency of the service, but maliciously, merely because his superior did not like him, or merely because he wanted his job for some friend of his, then obviously the employee's discharge was wrongful and illegal and, therefore, he is entitled to recover whatever loss he may have suffered thereby.

"In innumerable cases it has been held that where discretion is conferred on an administrative officer to render a decision, this decision must be honestly rendered, and that if it is arbitrary or capricious, or rendered in bad faith, the courts have power to review it and set it aside. This court has this question presented to it constantly in cases arising under Government contracts, where the contracting officer and the head of the department are given the power to render final decisions on questions of fact. Both this Court and the Supreme Court have many times held that if the decision is arbitrary or capricious or so grossly erroneous as to imply bad faith, it will be set aside. See e. g. Burchell v. Marsh, 17 How.

344, 349, 15 L.Ed. 96; Kihlberg v. United States, 97 U.S. 398, 24 L.Ed. 1106; United States v. Gleason, 175 U.S. 588, 602, 20 S.Ct. 228, 44 L.Ed. 284; Ripley v. United States, 223 U.S. 695, 701, 32 S.Ct. 352, 56 L.Ed. 614.

"The court will not substitute its judgment for that of the administrative officer, but the employee nevertheless has the right to the honest judgment of the administrative officer. If that officer does not render an honest judgment but acts arbitrarily, capriciously or maliciously, then undoubtedly the rights of the employee have been violated.

"The plaintiff in this case alleges that he was discharged 'without cause, wrongfully, illegally and maliciously.' If he was discharged maliciously and without cause, then he has been deprived of the rights which the Act of 1912 gave him, and he is entitled to maintain this suit under section 145 of the Judicial Code, sec. 250, Title 28, U.S.C. A., which gives this court power to render judgment upon a claim 'founded upon * * * any law of Congress.'"

Our task in this case, therefore, is to determine whether or not plaintiff was discharged for the good of the service, or arbitrarily, or capriciously, or maliciously.

■■ Personnel disputes are hard to resolve. In undertaking to do so, we start out with the presumption that the official acted in good faith. We are always loath to find to the contrary, and it takes, and should take, well-nigh irrefragable proof to induce us to do so. In this case, however, we have reluctantly come to the conclusion that plaintiff's superiors in discharging her were motivated, not by the good of the service, but by personal animus. In arriving at this conclusion we have not only considered the Commissioner's reports, and the briefs and argument of counsel, but we have read the testimony in the case, and considered the exhibits.

We are particularly impressed with plaintiff's testimony. It was straightforward, frank, without any effort to evade, and not intemperate. It "stood up" on cross-examination. On the stand she showed no passion, but was at all times courteous and ladylike, even under rigid cross-examination by the Government counsel. We did not see her on the stand, but the Commissioner who did see her confirms our impression.

She was employed by the National Labor Relations Board on November 24, 1947, as a Classification Analyst on a probational basis. Upon the expiration of six months, her employment became permanent. Her superior was Mrs. Barbara Amerman, who was the only other employee of the National Labor Relations Board engaged in this work.

When the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., was passed, it was thought necessary to employ an additional analyst on a temporary basis to help classify the additional personnel to be employed to administer this Act. Mrs. Charlotte Gable was employed in March or April 1948. This woman—and this we regard of especial significance, in the light of what followed—was a personal friend of Mrs. Amerman's, the chief of the section. This fact was made known at the time to Mrs. Amerman's superiors, Mr. Shover and Mr. Shaw.

Mrs. Amerman and the plaintiff shared an office on the seventh floor of the N. L. R. B. building until Mrs. Gable was brought into the Classification Section. At that time, the plaintiff's desk was moved to the third floor where a desk was also provided for Mrs. Gable. Within a short time, however, Mrs. Gable moved back to the seventh floor with Mrs. Amerman, leaving the plaintiff alone in the room on the third floor. From then on the work which had been previously assigned to plaintiff was gradually taken away from her and turned over to Mrs. Gable, until finally plaintiff was left with no work to do. From then on she was completely ignored by her superior, Mrs. Amerman, except for one interview now to be related.

Plaintiff was employed on November 24, 1947, by the National Labor Relations Board on a probational basis, subject to audit of her personnel file by the Civil Service Commission. After a six months' trial period, her appointment became permanent. But in August or September 1948 it came to the attention of the Civil Service Commission that plaintiff had been separated from her former position with the Reconstruction Finance Corporation because she had abandoned her position; and, upon learning this, the Commission on September 7, 1948, notified the National Labor Relations Board that for this reason it would be necessary for plaintiff to fill out another form in which she should explain or justify the reason for her separation from the Reconstruction Finance Corporation. For some reason this request of the Civil Service Commission was not complied with, and on October 19 it again requested the National Labor Relations Board to have Mrs. Knotts make out this form.

When this came to the attention of Mrs. Amerman, she called plaintiff to her office and accused her of lying when she had made out her original form, since she had not disclosed that she had abandoned her former position at the Reconstruction Finance Corporation. Plaintiff told her that she did not know her separation was so regarded, that for a long period of time she had been sick following the birth of her last child, and that when she finally returned to her job with the Reconstruction Finance Corporation she was told that it had been filled; but she stated that she did not understand that her separation had been classified as an abandonment of position.

The record indicates that this was the last contact between Mrs. Amerman and plaintiff. Very shortly thereafter, however, Mrs. Amerman wrote to Mr. Shover, the Personnel Director, a memorandum recommending that Mrs. Knotts be relieved of her position and, by inference, that Mrs. Gable be retained. Her

memorandum is set out in a footnote below.[1]

The assigned reasons for her recommendation were that on one occasion Mrs. Knotts had misstated the facts, that she had failed to obtain and report accurate and adequate facts, that she had been guilty of professional indiscretion and had made technical and clerical errors, and that she had been lacking in cooperation and in the observance of proper channels.

This recommendation was acted upon promptly by Mr. Shover. Indeed, it is apparent that Mrs. Amerman's recommendation was made after consultation with Mr. Shover and with Mr. Shover's superior, Mr. Shaw, the head of the Administrative Division. Mr. Shaw testified that he directed Mrs. Amerman to prepare the memorandum. On the next day, November 3, 1948, after receipt of Mrs. Amerman's memorandum, Mr. Shover wrote the Civil Service Commission a letter suggesting that it set aside plaintiff's permanent appointment, and that it give her a temporary appointment for 12 months from the date of her original appointment, which would have expired November 23, 1948. Shover also wrote that it was the intention of the Board to abolish the position of classification analyst CAF–7, which was the position held by plaintiff, on December 1. Mrs. Amerman's friend, Mrs. Gable, who had been brought in as a classification analyst on a temporary basis, held grade CAF–9.

The Civil Service Commission later refused this request, but eventually plaintiff was discharged and Mrs. Gable was retained.

In the meantime, Mr. Shover embarked on a campaign to force plaintiff to resign. He permitted Mrs. Amerman, who was his subordinate, to take all work away from plaintiff and to leave plaintiff by herself on the third floor with no work to do. He forbade other employees from having lunch with plaintiff and from associating with her in any way.

On a certain occasion Shover was having a picnic at his home for some of the employees. Plaintiff, who lived in the same neighborhood as Shover, told him she would take two or three of them, whom she named, in her car, although she herself could not go to the picnic because she had to care for her children and her husband. On the day of the picnic, just before closing time, Shover called plaintiff and told her that he wanted her to take two or three negro couples instead of the people she had named. Plaintiff refused, and took no one.

One day, after most of the employees had left the building, and while plaintiff was alone on the third floor, a negro man by the name of Carl Snipes came into plaintiff's office to inquire about his classification, stating that he understood that plaintiff was working on it. Plaintiff says that she felt uneasy, being alone on the third floor with this man, after everybody had gone, and she called Mr. Shaw's office, who, she understood, frequently worked late in the afternoon. On finding Mr. Shaw in, she sent Snipes up to see him. Shaw reported this incident to Shover and Mrs. Amerman. The following day Mrs. Gable came down to the third floor to see plaintiff, much incensed at what she termed plaintiff's interference in a matter that she was handling, and she asked plaintiff what she was trying to do; "are you trying to beat Mrs. —'s time with Carl Snipes?"

Mrs. Gable was plaintiff's immediate superior when Mrs. Amerman was away, and it was she whom Mrs. Amerman

---

1. "Attached is a report concerning Elizabeth P. Knotts, Position Classifier, Grade CAF–7. In view of this report, I believe that Mrs. Knotts has not proved suitable as a Position Classifier, and to continue her services would not be to the best interests of the office. Consequently, I recommend that she be relieved of her assignment in the Classification Section immediately.

"It is hoped that the use of one well qualified Position Classifier in addition to Mrs. Amerman will be sufficient for our needs for the time being, and, therefore, the CAF–7 position will not be filled."

**634**

and Mr. Shover intended to retain on a permanent basis when they got rid of plaintiff.

This course of conduct on the part of Mrs. Amerman and Mr. Shover quite naturally caused plaintiff a great deal of uneasiness, and she went to see Mr. Shaw, who was the head of the Division of Administration, and Mr. Shover's and Mrs. Amerman's superior, to get him to intercede in her behalf.

Both Mr. Shover and Mrs. Amerman had already discussed plaintiff's case with Mr. Shaw; hence, Mr. Shaw met plaintiff's request for intercession with an argument to convince her that she should consent to the change in her status from permanent to temporary, with the promise that they would give her an additional 30 days after November 23, 1948, in which to find a job in some other agency. He told plaintiff that if she did not consent to this that she would receive an "unsatisfactory" rating, which would prejudice her in getting a job elsewhere. His conversation with plaintiff was on November 10.

On the following day he wrote her a long memorandum confirming his conversation with her.

Six days later, on November 17, Mr. Shaw wrote her another memorandum stating that Mr. Denham, the General Counsel, meant to interview her, but had not been able to do so on account of her illness. (She had been much upset by her interview with Mr. Shaw, and had gone home sick.) He further told her that she would be relieved of her duties as a classification analyst, and concluded his memorandum with this paragraph:

"Let me also confirm in writing your verbal agreement of November 12 to discuss your views of the work and personnel of the Personnel Branch only with Mr. Denham, Mr. Smith, or myself until such time as your case has been disposed of. It is understood, of course, that it may become necessary for you to consult certain other persons in order to obtain facts respecting your case. You also agreed that it would be undesirable and improper to have any outside pressure brought to bear upon me or Mr. Denham while your case is under consideration."

(Senator Hoey, of North Carolina, from which State plaintiff comes, had vigorously interceded in plaintiff's behalf. That is the explanation for the last sentence.)

On November 18, Mr. Denham, the General Counsel and in overall charge of personnel matters, had an interview with plaintiff. He stated the substance of this interview in a long memorandum to Mr. Shaw. In it he said he told her she ought to find a job elsewhere, and that if she persisted in staying on she would wind up with an "unsatisfactory" efficiency rating, which he said he wished to avoid. His memorandum, which is set out in full in the findings, shows that he was thoroughly cooperating with Mrs. Amerman, Mr. Shover, and Mr. Shaw.

Within a few days plaintiff had a nervous breakdown and was treated in a local hospital for two or three weeks.

Later, plaintiff telephoned Mr. Shaw that she was ready to come back to work, but Shaw made the astonishing, but revealing, reply that he could not permit her to do so until he had had a talk with her physician. She presented a certificate from her doctor that she was able to resume her work, but still Shaw told her he would not permit her return until he had had a personal talk with her physician.

She came back anyway, and Shaw put her to work reading the Taft-Hartley Act. Later, she was given some sort of clerical work to do in the Industrial Analysis Branch of the National Labor Relations Board. Later she was transferred to another section.

On April 28, 1949, the Civil Service Commission turned down the request made by Mr. Shover's letter to put Mrs. Knotts on a temporary status, and confirmed her rating as a classification analyst CAF-7.

So, balked in their design to induce or to force her to resign, there was now nothing left to do but to prefer charges against her, and, thus, to dismiss her.

Preparatory thereto both Mr. Shover and Mr. Shaw instructed the chief of the section where Mrs. Knotts had been working, since her dismissal from the classification section, to report to them any derogatory matter which might come to his attention concerning plaintiff. Parenthetically, no such report was made, but, instead, the chief of this section stated that her work was satisfactory.

Finally, Mr. Denham instructed Mrs. Amerman and Mr. Shover, in conjunction with Mr. Shaw, to prepare the charges, the charges were:

"1. You have fomented, or participated in, discussions and dealings which tend to create or aggravate factions and critical attitudes in one or more persons towards others in the agency.

"2. You have made inaccurate or misleading statements.

"3. Your comments and activities interfere with, or give the wrong impression concerning the work and character of officials and employees of this Agency.

"Examples to illustrate these reasons are shown below."

\* \* \* \* \*

This was followed by a long list of things, most of which seem trivial, and frequently without any substance at all. At any rate, they are at variance with the rating plaintiff received for her services during the period in question.

The matter of this rating is pertinent. Plaintiff's services were rated by her superiors as "unsatisfactory." As originally made, it covered the period of April 1, 1948, to March 31, 1949, but later, for some reason, the date of March 31, 1949, was lined through and the date November 15, 1948, was substituted, although Mrs. Amerman signed the rating on May 31, 1949, and Mr. Shover, on June 10, 1949.

Plaintiff appealed from this rating. An appeal panel of two men was appointed by Mr. Shaw. One member of the panel rated plaintiff "good," and the other one "fair."

The charges mentioned above are also inconsistent, at least in part, with the letter "To whom it may concern," written by Mr. Shaw on June 7, 1950. This letter reads:

"It is our understanding that Mrs. Elizabeth P. Knotts is applying for Federal employment in some of the following fields, namely, Office Services, Information, Administrative Assistant, Receptionist, processing correspondence, or handling Mails and Files.

"Mrs. Knotts was formerly employed by this Agency from November 24, 1947, to July 20, 1949. She came into employment here as a classification analyst CAF–7. Our records indicate that her efficiency rating for the first 6 months of her employment was "Good".

"In the capacity as a junior classification analyst, Mrs. Knotts surveyed a number of positions, assembling data needed by the Classification Officer to determine the complexity and difficulty of each job. After a period of somewhat less than a year, we found that this arrangement had certain disadvantages, and that the needs of the Agency would be better served by engaging a more experienced assistant to work with our Classification Officer. It also became apparent that the circumstances did not justify retaining also a junior analyst. Arrangements were made at that time to give Mrs. Knotts an opportunity to find employment elsewhere.

"While Mrs. Knotts was seeking another position, she was temporarily assigned to clerical work in the Division of Administration. This work she carried on in an adequate manner. It is our opinion that Mrs. Knotts is qualified for, and could

perform satisfactorily in, a junior level position in any of the fields of work enumerated in paragraph one."

In the meantime the delegation of authority as to personnel matters which had been given by the Board to Denham had been withdrawn.

Denham forwarded the rating to the Board with a vigorous and lengthy letter of protest. On October 26, 1950, after her dismissal, plaintiff received a letter from the chairman of the Board notifying her that she had been rated "fair."

To return to the charges—Mr. Denham preferred them on July 6, 1949; plaintiff was given until July 13 within which to make reply. Mr. Denham notified her that unless her reply induced him to change his mind, that she would be discharged on July 20, 1949. Plaintiff replied requesting a hearing, but Mr. Denham refused the hearing, saying that he knew all about the case anyway; and plaintiff was accordingly discharged on July 20, 1949.

All this leads us to the conclusion that the reason for plaintiff's discharge was not the unsatisfactory character of her services, but was because Mrs. Amerman wanted to get rid of her in order that her friend, Mrs. Gable, might take her job, and that she initiated a conspiracy between Mr. Shover, Mr. Shaw, Mr. Denham, and herself to bring about this result. The record convinces us that Denham was a part of this conspiracy, and that when he preferred these vague charges, and found plaintiff guilty of them and dismissed her, he was motivated not by what he thought was the good of the service, but by the aims of the conspiracy, which was to get rid of plaintiff so Mrs. Gable could have her job.

Mrs. Amerman had originally rated plaintiff "good," but when Mrs. Gable came, she rated plaintiff's services "unsatisfactory," but this was reversed on appeal. Nothing had happened since the initial "good" rating to justify Mrs. Amerman in giving plaintiff the "unsatisfactory" rating. We are convinced she did so in order that her friend Mrs. Gable might have her job. In this she was aided and abetted by Mr. Shover, Mr. Shaw, and Mr. Denham.

If we are correct in this, then the Act of August 24, 1912, 37 Stat. 539, 555, U.S.C.A. Title 5, sec. 652, has been violated, which provides that no person in the classified Civil Service shall be discharged "except for such cause as will promote the efficiency of such service * * *."

■ This being true, plaintiff is entitled to recover. She asks for her salary from the date of her discharge on July 20, 1949, to April 17, 1951. She may recover for the period from July 21, 1949 to April 17, 1951. The amount thereof, less earnings from other employment, is $6,969.01. Judgment for this amount will be entered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.