Dorothea M. SCROGGINS

v.

The UNITED STATES.

No. 352-66.

United States Court of Claims.
June 14, 1968.
Certiorari Denied Nov. 18, 1968.
See 89 S.Ct. 376.

held to have waived its right to a jury trial.

Byron N. Scott, Washington, D. C., attorney of record, for plaintiff.

Mary M. Schroeder, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFF'S COUNTER-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This is another case in which a civilian government worker contests her involuntary placement on the disability retirement list. See McGlasson v. United States, No. 186–61, Ct.Cl., 397 F.2d 303, decided this day. Mrs. Scroggins was a food service worker in the cafeteria of the Public Health Service Hospital in Baltimore. In April 1965, following an altercation with a fellow-worker and plaintiff's continuing complaints about that employee, the hospital asked her to submit to a psychiatric examination. She requested that this be done at Johns Hopkins Hospital but did not give the name of the doctor she desired to undertake the examination or furnish the Public Health Service with any report from a psychiatrist.

She also did not submit herself for psychiatric examination at the Public Health Service Hospital. Thereupon the employing agency, on April 27, 1965, transmitted to the Civil Service Commission an application for her involuntary retirement "since she is unwilling to apply." Accompanying the application were statements by two psychiatrists at the Public Health Service Hospital, copies of certain of the agency's prior correspondence with plaintiff, and a memorandum by her supervisor describing events leading to the application.[1] On May 4, 1965, the Commission asked plaintiff to undergo a psychiatric examination (at government expense) at a federal facility. An appointment for such an examination was made and then canceled at her request. Apparently she failed to agree to an examination by a doctor acceptable to the Commission. On June 14, 1965, the Commission's Bureau of Retirement and Insurance notified her of the approval of the involuntary application, and of her appeal rights. Her counsel noted an appeal.

The Commission's Board of Appeals and Review directed a psychiatric examination before it would make its decision, and, at the Commission's request and the urging of her counsel, plaintiff underwent (at the cost of the Government) such an examination by Dr. H. D. Shapiro, a privately-practicing qualified psychiatrist in Washington. (Dr. Shapiro was selected by the Commission.) He diagnosed her condition as a paranoid reaction and concluded that she was disabled for the job of food service worker. After receipt of this report, and "careful consideration of all the facts in Mrs. Scroggins' case"—the record before it included materials furnished by the plaintiff—the Board of Appeals and Review determined "that the medical evidence of record discloses disabilities of sufficient severity upon which to base a conclusion that Mrs. Scroggins is totally disabled for useful and efficient service in the position of Food Service Worker within the meaning of the Retirement Act." On plaintiff's request for review by the Commissioners themselves, they found the Board's decision correct "and that the action of retiring Mrs. Scroggins for disability reasons was justified."[2] She sues to set aside these determinations. Both parties move for summary judgment, resting on the record before the Commission.[3]

■ The Retirement Act provides (5 U.S.C. § 8347 (1964 Supp. II), formerly 5 U.S.C. § 2266) that "the Commission shall determine questions of disability and dependency" and its decisions "concerning these matters are final and conclusive and are not subject to review." This is a special and unusual restriction on judicial examination, and under it courts are not as free to review Commission retirement decisions as they would be if the "finality" clause were not there. We have said that, at best, a court can set aside the Commission's determination "only where there has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error 'going to the heart of the administrative determination.'" Gaines v. United States, 158 Ct.Cl. 497, 502, cert. denied, 371 U.S. 936, 83 S.Ct. 309, 9 L. Ed.2d 271 (1962). See also the trio of District of Columbia Circuit decisions decided in July 1956, Ellmore v. Brucker, 99 U.S.App.D.C. 1, 236 F.2d 734, cert. denied 352 U.S. 955, 77 S.Ct. 329, 1 L.Ed. 2d 244; Murphy v. Wilson, 99 U.S.App. D.C. 4, 236 F.2d 737, cert. denied, 352 U.S. 954, 77 S.Ct. 326, 1 L.Ed.2d 243; and Smith v. Dulles, 99 U.S.App.D.C. 6,

---

1. The hospital also certified that attempts to place plaintiff with other federal hospitals in Baltimore were unsuccessful.

2. Plaintiff's counsel did not have a copy of Dr. Shapiro's report before the decision of the Board of Appeals and Review but did receive a copy before taking the appeal to the Commissioners.

3. Plaintiff also adds two medical statements which were not before the Commission.

236 F.2d 739, cert. denied, 352 U.S. 955, 77 S.Ct. 329, 1 L.Ed.2d 244.

■ Plaintiff does not urge that she was deprived of any of her procedural rights under the Commission's regulations, but she does ask us to hold that a trial-type hearing (or the prime elements of one) had to be given her under the statute and the Constitution.[4] This court and three circuits have already declared otherwise. Gaines v. United States, supra, 158 Ct.Cl. at 502; Kleinfelter v. United States, 318 F.2d 929, 932, 162 Ct.Cl. 88, 93 (1963); Ellmore v. Brucker, supra, 236 F.2d at 736; Murphy v. Wilson, supra, 236 F.2d at 738; Smith v. Dulles, supra, 236 F.2d at 740; Cerrano v. Fleishman, 339 F.2d 929, 931 (C.A. 2, 1964), cert. denied, 382 U.S. 855, 86 S.Ct. 106, 15 L.Ed.2d 93 (1965); United States v. Abbett, 381 F.2d 609, 612 (C.A. 5, 1967); Chafin v. Pratt, 358 F.2d 349, 356–358 (C.A. 5, cert. denied, 385 U.S. 878, 87 S.Ct. 159, 17 L.Ed.2d 105 (1966). On this point, see also the plurality and concurring opinions in McGlasson v. United States, supra, decided this day. We know no adequate reason to depart at this time from that unanimous position.[5]

The Commission can, of course, grant more procedural rights than the minimum required by the Constitution and the Retirement Act. Indeed, the Commission has just recently modified its practice in these cases of involuntary retirement—particularly those submitted on mental grounds—so that the employee and the public can feel more secure that a proper result is being reached.[6] Just because an administrative scheme with lesser protections is *legal* is not a good reason for withholding improvements which are desirable and called for. See Sobeloff, "Attorney for the Government: The Work of the Solicitor General's Office", 41 A.B.A. Jour. 229, 231 (1955). Although an agency may be under no legal mandate, it has a public obligation, unenforceable in the courts but nevertheless real, to review its procedures and rules to take account of a substantial body of complaints. The Commission appears to have responded to that public obligation in reconsidering its practice and adopting new procedures. These new regulations did not, of course, govern the present case, and we do not in any way pass upon them. For this case it is enough that we are unable to say that the Commission was earlier compelled by law, the Congressional scheme being what it is, to upgrade its procedures, even though that course might have been wiser or more advisable.

■ The only other question is whether the Commission, in appraising the materials before it, made an error going to the heart of the administrative determination.[7] Since we cannot weigh the evidence for ourselves or even apply the conventional "substantial evidence" standard, there is little point to setting out a full summary of the record. The Board of Appeals and Review, as well as

---

4. This point was not made in the petition or in plaintiff's brief but was raised in oral argument.

5. Plaintiff calls a disability retirement for psychiatric reasons a "badge of infamy." In answer to a similar argument, the Fifth Circuit recently said (Chafin v. Pratt, supra, 358 F.2d at 357): "Appellant has not lost the right to work elsewhere as a secretary, retirement is certainly less drastic than outright discharge, and appellant's retirement for disability, even if interpreted as she does to be a finding of mental incompetence, casts no aspersion on her moral character or loyalty."

6. The Commission has been considering for some time a change in its procedures. See the outline of proposed revised procedures for agency-filed disability retirement claims enclosed with Chairman Macy's letter of June 27, 1967, to then President Sidney S. Sachs of the Bar Association of the District of Columbia. On May 24, 1968, the Commission adopted new regulations for these involuntary retirement cases. See 33 Fed.Reg. 7715–17, May 25, 1968.

7. There is no contention that the Commission misconstrued the substantive aspects of the Retirement Act or of its regulations.

the Commissioners, had before them Dr. Shapiro's three-page, single-spaced report (based on his psychiatric examination of the plaintiff) which contained the details of his psychiatric interview, what the plaintiff told him, how she responded to his questions, and his observations. His diagnosis was "Paranoid reaction in a setting of an artificially produced menopause", and he concluded that she was disabled for her job as food service worker and that the disability was indefinite in duration. The Commission also had the documents supplied by the Public Health Service. These included the detailed factual statement of the plaintiff's supervisor (the dietetic director at the Public Health Service Hospital), giving the supervisor's version of the employment difficulties with plaintiff. There was also a short statement by the Chief of the Psychiatric Service at the hospital,[8] and a larger and more detailed statement by a staff psychiatrist there who had also not examined Mrs. Scroggins at the time of the agency's application but who felt, from a telephone conversation with her and other observations, that various factors tended to suggest "that the patient is currently deteriorating into a serious psychiatric disorder" and was "rapidly approaching the point where she could be considered to be a danger to herself or to her fellow employees in the immediate future"; he recommended suspension "from further employment at this hospital until such time as she has been examined by the psychiatrist either at this facility or any of her choosing."

■ On the other side were short written medical statements, favorable to her position, which were supplied by plaintiff. The four statements by psychiatrists were very summary and conclusory, with little or no supporting detail.[9] A gynecologist said, after referring to physical matters, that she was "a perfectly healthy woman with an artificially induced menopause" who was "fit for any kind of duty compatible with her age." Plaintiff has attached to her summary judgment motion two statements by psychiatrists, who saw her at her request, which were not put before the Commission though available at the time. See note 3 supra. Passing the question whether we should consider these at all, we note that one is a two sentence note that the doctor had examined Mrs. Scroggins on January 19, 1965, and "could not find anything unusual in her behavior or thinking." The other doctor (who observed that he had seen no other medical records and no written statements from her employers) concluded that "her intelligence is within normal limits, and there is no evidence of psychosis. Her personality is that of an hysteric, and many aspects of the history are in keeping with this impression. She is legally sane, and, in my opinion, competent to handle her own affairs." (Under the Retirement Act, the issue is not whether the employee is legally sane or competent to handle her own affairs, but whether she is totally disabled for her job.)

■■ At most, this record presents a pure conflict of medical evidence, and it is of course settled that "a court cannot substitute its judgment on medical evidence for the determination of the Commission." Gaines v. United States,

8. "I have reviewed the records of the above-noted employee [Mrs. Scroggins], and discussed her behavior with those who have observed her in recent months. I have not examined her myself due to her refusal to be examined psychiatrically.

"From behavior described by various observers, however, I think we have no choice but to consider that she is at this point ill, and constitutes a possible danger to herself or others if she should return to her present employment, until she has been examined and cleared by acceptable psychiatric examination."

9. Of the four, two do not appear to have been by qualified specialists in psychiatry. One specialist simply said that he had "found no mental condition that would *necessarily* interfere with her being employed by the Federal Government" (emphasis added). This does not appear to take account of plaintiff's fitness for her particular job as food service worker.

supra, 158 Ct.Cl. at 502. See, to the same effect, Ellmore v. Brucker, supra, 236 F.2d at 736; Cerrano v. Fleishman, supra, 339 F.2d at 931. There is plainly no error going to the "heart of the administrative determination" when the Commission accepts one medical view rather than another.

■ Two other attacks on the determination are left. The first is that the Board of Appeals and Review and the Commissioners did not examine all the material before them. There is nothing whatever to support this charge and it is contradicted by the Board's observation that it carefully considered "all the facts." An unsupported allegation of this kind is obviously fruitless. Cf. Harrington v. United States, 161 Ct.Cl. 432, 442 (1963).

■■ The other assertion is that the Commission's decision was vitiated by bad faith since, it is said, both the report of Dr. Shapiro and that of Dr. Alderete (the staff psychiatrist at the Public Health Service Hospital) were made in *mala fide*. This is an issue which could have been, but was not, presented to the Board of Appeals and Review and to the Commissioners. Under Pine v. United States, 371 F.2d 466, 178 Ct.Cl. 146 (1967), we need not consider it. In any event, the assault is based on nothing but disagreement with certain of the statements in the reports which fall far short (on the most adverse interpretation) of indicating bad faith. No affidavits are presented nor detailed factual allegations made. There is no reason for a further inquiry on this point (Greenway v. United States, 163 Ct.Cl. 72, 82 (1963)), and plaintiff does not even ask for a trial. Obviously, we have here nothing approaching the "well-nigh irrefragable proof" needed to show bad faith, personal animus, or "railroading". Knotts v. United States, 121 F.Supp. 630, 631, 128 Ct.Cl. 489, 492 (1954).

The plaintiff is not entitled to recover and her motion for summary judgment is denied. The Government's motion is granted and the petition is dismissed.

SKELTON, Judge (concurring):

I am not satisfied with the result reached in this case and would dissent if there was any legal ground upon which I could do so. After careful consideration of the law and the facts and the very able opinion of the court, I have reluctantly concluded that there is nothing this court can do to right the wrong that has been done to the plaintiff.

However, I feel that I must point out some of the injustices in the case and the obvious weaknesses of the system by which plaintiff was disposed of.

It is apparent from reading the record in the case that the plaintiff became involved in a quarrel or controversy with two other women employees. The other two had a fight and during its progress, one of them kicked plaintiff on the leg. Plaintiff complained to her superiors, but the other two women who had the fight denied the altercation and vowed to get even with plaintiff for telling on them. The superiors believed the combatants and disbelieved plaintiff. However, the truth of the kicking incident was later verified by the fact that a surgeon in Johns Hopkins Hospital performed an operation to remove the bruise on plaintiff's leg.

At this point, if the agency for which plaintiff worked had any complaint against her for this incident, it could have preferred charges against her for cause. But such route would have entitled plaintiff to a hearing with witnesses and the right of cross-examination. The agency took the easy way out (for it) by selecting psychiatry as the way to settle the matter. By this route, plaintiff would not have a right to a hearing, and, for all practical purposes, no rights at all.

The agency filed an application to retire plaintiff on the ground that she was mentally disabled to perform her duties because of schizophrenic paranoia. Attached to the application were statements of two psychiatrists that were so ridiculous they would cause any reputable member of the profession to blush

with embarrassment. One of them had examined plaintiff about a year before and found her to be without psychiatric difficulty. Neither had examined her since the present difficulty began. One of them based his adverse opinion on an alleged telephone conversation with plaintiff and on hearsay statements of various persons who were alleged to have observed plaintiff. The other expert said that he had tried to examine plaintiff but she had refused to see him and "her refusal to have this psychiatric examination is common place among patients with symptomatology of paranoid schizophrenia." To say this statement is ridiculous, is to put it mildly. Her refusal to submit to such an examination by an agency psychiatrist under the circumstances was not credible evidence of paranoid schizophrenia, but on the contrary, was an indication of good judgment on her part. Probably nine out of ten perfectly normal people in her position would have refused such an examination under the conditions then existing.

This medical evidence, if you can dignify it by so referring to it, together with the unsworn statement of plaintiff's supervisor, which contained all of the gossip, rumors, and statements that had been gathered together about plaintiff, formed the basis of the complaint against her and was attached to the application to retire her for mental disability.

But the significant bit of evidence that showed that the agency did not really believe plaintiff was mentally disabled, was the statement attached to the application from A. O. Fields, Personnel Officer of the United States Public Health Service Hospital where plaintiff worked, which said, "This is to certify that attempts to place Mrs. Dorothea M. Scroggins with other Federal Hospitals in Baltimore were unsuccessful." In other words, this showed that they had

been trying to get her a job in another hospital. They would not have done this if they had thought she was mentally disabled from doing work. This is proof that all they really wanted to do was to get rid of plaintiff.

It was upon this kind of evidence that the agency determined on June 14, 1965, that plaintiff was totally disabled and she was retired. At that time, the agency had no report of any psychiatrist or doctor who had examined plaintiff and who said she was disabled. On the other hand, plaintiff had furnished a statement of Dr. Scorgie of Johns Hopkins Hospital, who said she was "fit for any kind of duty compatible with her age," and a statement of Dr. Sutley of Baltimore who said "she was in good control of her mental faculties and not considered to be mentally ill." The agency paid no attention at all to these recent medical reports.

Later on, plaintiff agreed to a psychiatric examination by a CSC selected psychiatrist named H. D. Shapiro. He reported that she had paranoid reaction and was disabled from doing her work. This report doomed the plaintiff, although she later obtained reports from two other psychiatrists saying there was nothing wrong with her mentally.

The system used here and used in the case of McGlasson v. United States, No. 186–61, Ct.Cl., 397 F.2d 303, decided this day (in which I dissented) is a most unsatisfactory and unjust way to proceed against a government employee whose services are no longer desired. There are no regulations establishing a procedure, although the CSC has the authority to promulgate them. 5 U.S.C. § 8347(a).[1] The employee is not entitled to a hearing (according to the decided cases). There are no witnesses nor any right of cross-examination. Hearsay, gossip, rumors, and everything else can be and probably is considered. The employee is not represented and does not

---

1. This opinion was prepared prior to the promulgation by the CSC of its new disability retirement regulations to be effective July 1, 1968. See 33 F.Reg. 7715–17 (May 25, 1968).

even know what is being considered against him or her. In most instances, the employee is helpless to do anything. It can safely be said that under this system, when an agency begins to look at an employee through "psychiatric-schizophrenic-paranoid colored glasses" and sets the retirement machinery in motion against him, he might as well "throw in the towel," because he does not have a chance to avoid retirement. Such a system should not be allowed to prevail. The court has commendably referred to the proposed procedures being contemplated by the CSC in cases of this kind which would eliminate many of the objections to the present system. I understand that such proposal would afford the employee a hearing with confrontation of witnesses and the right of cross-examination, and cases would be decided on substantial evidence, with all reasonable doubt resolved in favor of the employee. Such a procedure would be highly desirable. It is hoped that this proposal will be adopted by the CSC without delay.

Our court, in its opinion, inferentially rejects plaintiff's contention that a disability retirement for psychiatric reasons is a "badge of infamy" by citing with apparent approval the holding in Chafin v. Pratt, 358 F.2d 349, 357 (5th Cir. 1966), cert. denied, 385 U.S. 878, 87 S.Ct. 159, 17 L.Ed.2d 105, which states that "* * * a finding of mental incompetence casts no aspersion on her moral character or loyalty." This statement is correct as far as it goes, but it misses the mark in our case. Neither the morals nor loyalty of plaintiff is involved in the slightest degree. The plaintiff is in reality complaining, by her "badge of infamy" charge, that a disability retirement of an employee by a government agency for psychiatric reasons creates a "stigma" against the employee that can never be outgrown nor overcome. I agree with the plaintiff. Certainly no government agency would likely hire an employee who had

been so retired, and it is unlikely any other employer with desirable employment would do so. We might as well be practical about it. A charge and a decision of mental disability against an employee does as an actual fact cast a stigma on the employee. Consequently, such a charge should never be lightly or carelessly made, and, when made, the employee should be given the right to protect himself and his job in a procedure that guarantees him a trial with all the rights and privileges attendant upon such a trial. It is hoped that such a procedure will soon be established.

Finally, notwithstanding the fact that I feel that plaintiff has been done an injustice here, there is nothing this court can do. The Congress has said that the action of the CSC is final and not subject to review, 5 U.S.C. § 8347(c). We can overturn a CSC decision only in those few instances where there has been a substantial departure from important procedural rights, a misconstruction of the governing legislation, or some like error going to the heart of the administrative determination. Gaines v. United States, 158 Ct.Cl. 497, 502 (1962), cert. denied, 371 U.S. 936, 83 S. Ct. 309, 9 L.Ed.2d 271 (1962). None of these exceptions exist here.

This case differs from that of McGlasson v. United States, supra, because in that case there was no evidence that the plaintiff was totally disabled from doing her work. In the case at bar, there was evidence of total disability of the plaintiff in the form of Dr. Shapiro's report. We cannot overturn the decision of the CSC based on that report, even if we would have reached a different decision if we had tried the case. Ellmore v. Brucker, 99 U.S.App.D.C. 1, 236 F.2d 734, 736, cert. denied, 352 U.S. 955, 77 S.Ct. 329, 1 L.Ed.2d 244 (1956); Gaines v. United States, supra.

DURFEE and COLLINS, Judges, JJ., join in the foregoing concurring opinion.