AM–PRO PROTECTIVE AGENCY,
INC., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 01–5077.

United States Court of Appeals,
Federal Circuit.

Feb. 26, 2002.

A. Camden Lewis, Lewis, Babcock & Hawkins, L.L.P., of Columbia, SC, argued

for plaintiff-appellant. On the brief was Mark W. Hardee.

Marian E. Sullivan, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel on the brief was Dennis J. Gallagher, Assistant Legal Adviser, U.S. Department of State, of Rosslyn, VA.

Before NEWMAN, MICHEL, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

Plaintiff–Appellant Am–Pro Protective Agency, Inc. ("Am–Pro") appeals from a judgment of the United States Court of Federal Claims dismissing, as untimely, the contract action that Am–Pro brought against the government and holding, in the alternative, that the government was entitled to summary judgment based on a previously executed release. *See Am–Pro Protective Agency v. United States*, No. 98–940C, slip op. (Feb. 2, 2001). At the same time, the trial court rejected Am–Pro's assertion that it had executed this release under duress, meaning (according to Am–Pro) that neither the release nor the applicable limitations period barred its contract claim.

Because the only evidence Am–Pro relies on in opposition to summary judgment—an uncorroborated affidavit executed six years after the government's alleged wrongdoing occurred—cannot create a genuine issue and meet the high evidentiary burden of proof needed to overcome the presumption that government officials act properly and in good faith, we reject Am–Pro's argument that it was entitled to a trial. We therefore affirm the grant of summary judgment in favor of the govern-ment. Accordingly, we need not review the dismissal under RCFC 12(b)(1).

## Background

On June 21, 1989, Am–Pro was awarded Contract No. 1038 963119 to provide guard services for the Department of State's facilities in the Washington, DC, area and at the United States Mission to the United Nations in New York City, New York. This dispute first arose in 1991, when Am–Pro suggested that the government owed it additional compensation for hours it was paying its employees to work during "breaker hours." "Breaker hours," as defined by Am–Pro, were the hours for lunch breaks and the two fifteen-minute breaks that Am–Pro was required to provide each guard under the contract. During these times, Am–Pro had to either have another guard fill in for the guard on break or else have that guard work through his break. Am–Pro asserted that it had not been compensated either for the cost of paying another employee to stand guard while the employee assigned to a post was taking one of these required breaks or for the extra cost of paying overtime to these guards who worked through their breaks.

On January 9, 1992, Am–Pro representatives and counsel met to discuss the "breaker issue" with the Contracting Officer ("CO") and other Department of State representatives. At this meeting, the CO notified Am–Pro that she would have to consider the pending breaker issue when deciding whether to exercise options on the contract. According to Am–Pro, however, the CO framed this consideration as a threat, allegedly stating that if Am–Pro chose to file a formal claim, she would promptly disapprove it and that, if Am–Pro thereafter appealed her decision, the CO would cancel and re-solicit the existing contract. *See* Brown Affidavit at ¶ 9 (May 20, 1998).

By letter to Am–Pro dated April 8, 1992, the CO reiterated her concern about whether Am–Pro's price for the contract was known, given its claim for additional compensation under the contract. The CO maintained that the intent of the parties at the time of contract formation was that Am–Pro would provide "breakers" within the contract price for the first 18 months of performance, and that "the principle that breakers are not separately compensable was firmly established by contract performance." Consequently, the CO indicated that she would have to consider the government's future potential liability when deciding whether to exercise future options on the contract.

On May 29, 1992, Am–Pro submitted a certified claim to the CO seeking recovery of $2,593,389 for breaker hours from the date of the contract's inception to April 15, 1992. In September 1992, the CO denied this claim in its entirety, finding that the contract was a fixed-price contract and that all the costs of contract performance were therefore included in Am–Pro's original bid price. The relevant contract terms stated "This is a Fixed Price and Time and Materials Contract.... The initial 120 day period of the contract will be a Fixed Price arrangement. After the initial 120 day period, the contract will become Time and Materials." Am–Pro nevertheless asserted that the contract was a time and materials contract. The CO further explained that "[i]n actual performance and in accord with section B of the contract, the contract is firm, fixed-price with a composite billing rate that utilizes time and materials terms to ensure performance and payment." The CO also found that "Am–Pro's cost proposal contain[ed] several elements

which provide for compensation for providing supervisor and guard breaks." Am–Pro did not appeal the CO's decision.

The parties met again on November 3, 1992. Am–Pro alleges that, at this meeting, the CO "repeated her threat of canceling the Contract if Am–Pro continued to have its Contract rights protected by appealing her interpretation of the Contract." Brown Decl. at ¶ 12. Further, Am–Pro alleges, the CO threatened to "adversely impact [its] ability to contract with other agencies of government...." *Id.* The CO denies the accuracy of these three allegations. *See* Cain Decl. at ¶ 10.

In a letter dated November 5, 1992, Am–Pro notified the CO that it had asked its attorneys to prepare a letter expressing "its willingness to terminate all claims past and present" regarding the breakers' issue. By letter dated November 10, 1992, Am–Pro confirmed that it had "withdrawn" the claim that was subject to the September 1, 1992, final decision of the CO. And it agreed that it would not appeal the CO's final decision or submit any future claim for costs attributable to the "breaker" issue, thereby effectively releasing the government from any future claims for breaker hours. Under this release, the CO agreed that Am–Pro would not be excluded from any other competition for further Department of State security services contracts.[1] Nothing in the letters by Am–Pro (and presumably, its attorneys) alludes to the threats that allegedly occurred in the January 1992 and November 1992 meetings with the government.

At the end of the contract option period, the Department of State entered into another contract with Am–Pro for the provision of guard services through 1997. In

---

1. This statement likely stems from Am–Pro's concerns that the Small Business Administration might not release the contract from the Section 8(a) program for open competition and that Am–Pro had recently "graduated" from Section 8(a) status. *See* Cain Decl. at ¶ 10.

May 1998, nearly six years after the government allegedly threatened Am–Pro with cancellation, Am–Pro submitted a certified claim for $3,832,695.22. Attached to this claim was Am–Pro's original May 1992 claim for $2,593,389. Alleging that the letters dated November 5, 1992, and November 10, 1992, were written under duress and that the release was therefore invalid, Am–Pro sought compensation for the cost of the breaker hours allegedly incurred from 1989 to 1994.

Shortly thereafter, a new CO was assigned. On July 20, 1998, the new CO notified Am–Pro that he refused to consider its claim because Am–Pro had indeed released that claim in the November 10, 1992, letter and also because the claim was barred by Am–Pro's failure to timely appeal the first CO's decision. On December 29, 1998, Am–Pro sued the government in the Court of Federal Claims, challenging the new CO's decision and seeking payment in the amount of $3,832,695.22.

The Court of Federal Claims dismissed Am–Pro's complaint for lack of jurisdiction. Specifically, the court held that Am–Pro had failed to contest the CO's 1992 final decision within the one-year limitations period set forth in the Contract Disputes Act ("CDA"), 41 U.S.C. § 609(a)(1). *See Am–Pro Protective Agency*, No. 98–940C, slip op. at 8. Alternatively, the court granted the government's motion for summary judgment, reasoning that Am–Pro's 1992 release of claims for breaker hours on the contract also barred its present claim. *See id.* at 13. In so doing, the court determined that the only evidence Am–Pro provided to show its allegedly involuntary acceptance of the government's position on the breaker hours—an affidavit by Brown, the president and CEO of Am–Pro, drafted six years after the facts at issue—was insufficient to overcome the strong presumption that government officials (like

the CO here) carry out their duties lawfully and in good faith. That Am–Pro's attorneys helped draft the release, the trial court reasoned, only further weakened Am–Pro's claim for duress. It concluded that the November 10, 1992, release was therefore valid and binding.

Am–Pro timely appealed the Court of Federal Claims' judgment. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

### Discussion

■ We review the trial court's decision concerning the lack of jurisdiction *de novo, Brown v. United States,* 105 F.3d 621, 623 (Fed.Cir.1997), as we do its grant of summary judgment, *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987).

■ In this case, both the jurisdictional and summary judgment issues are inextricably intertwined in the determination of whether Am–Pro's inaction was excused by the duress allegedly caused by the CO's threats. As to jurisdiction, the CDA allows for two avenues of "appeal" from the decision of a CO: (1) appealing to the appropriate board of contracting appeals within 90 days; or (2) filing suit in the Court of Federal Claims within one year. *See* 41 U.S.C. §§ 606, 607, 609(a)(1), 609(a)(3). It is not disputed that Am–Pro did not timely file suit with respect to the 1992 claim. If we were to conclude that the failure to timely file could have resulted from duress, however, a plausible argument could be made for the equitable tolling of the statutory period. Similarly, if a reasonable fact finder could find duress, that duress would render Am–Pro's release invalid.

But given the high burden of proof necessary to overcome the presumption of good faith, and given the facts that tend to render Am–Pro's duress theory implausi-

ble, *e.g.*, the failure to claim duress until six years after the alleged coercion, the participation of Am–Pro's attorney in the meetings and in the drafting of the release, and the absence of any evidence supporting its claim except for an uncorroborated affidavit drafted six years after the dispute arose, we conclude that Am–Pro has failed to carry its burden of proof and cannot overcome the strong presumption that government contract officials exercise their duties in good faith. Accordingly, we hold that Am–Pro has failed to create a genuine factual issue about duress.[2]

The presumption that government officials act in good faith is nothing new to our jurisprudence. *See, e.g., Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954) (stating "we start out with the presumption that the official acted in good faith"). Nor is the strength of this presumption, at least insofar as it arises in the context of quasi-criminal wrongdoing by government officials acting in the course of their public duties. *See id.* In fact, for almost 50 years this court and its predecessor have repeated that we are "loath to find to the contrary [of good faith], and it takes, and should take, well-nigh irrefragable proof to induce us to do so." *Schaefer v. United States,* 224 Ct.Cl. 541, 633 F.2d 945, 948–49 (1980); *see also Grover v. United States,* 200 Ct.Cl. 337, 344 (1973); *Kalvar,* 543 F.2d at 1302; *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982); *T & M Distribs., Inc. v. United States,* 185 F.3d 1279, 1285 (Fed.Cir. 1999).

▮ While our court and its predecessor have often used the "well-nigh irrefraga-

ble" language to describe the quality of evidence required to overcome the good faith presumption, several cases instead use the phrase "clear evidence." *See, e.g., Librach,* 147 Ct.Cl. at 612 (stating that "clear evidence to the contrary" is necessary to overcome the presumption in favor of the government); *George v. United States,* 166 Ct.Cl. 527, 531 (1964) (same). The use of two different but nevertheless similar descriptions of the evidence needed to overcome this presumption may have led to some confusion. So, in line with our well-established precedent that a high burden must be carried to overcome this presumption, we now consider what proof is needed to show that the government acted in bad faith.

▮ Courts generally recognize three standards of proof: preponderance of the evidence, clear and convincing, and beyond a reasonable doubt. *See Price v. Symsek,* 988 F.2d 1187, 1191 (Fed.Cir.1993). Of the three, we believe that clear and convincing most appropriately describes the burden of proof applicable to the presumption of the governments good faith. This is so because, for one, the presumption of good faith, as used here, applies only in the situation where a government official allegedly engaged in fraud or in some other quasi-criminal wrongdoing. *See Addington v. Texas,* 441 U.S. 418, 423–24, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (discussing the three burdens of proof outlined above and the situations in which they ordinarily apply). In addition, we believe the clear and convincing standard most closely approximates the language traditionally used to describe the burden for negating the good faith presumption; namely, the "well-nigh,

---

2. Because additional monies and time frames are implicated in the 1998 claim which was timely appealed, we do not agree that the 1992 and 1998 claims were identical as held by the court below. Here we do not address the question of untimeliness. *See Nippon*

*Steel v. United States,* 219 F.3d 1348, 1351–53 (Fed.Cir.2000) (stating that the practice of bypassing jurisdiction and addressing the merits is permissible where a jurisdictional and a merits issue are "inextricably intertwined").

irrefragable" proof standard. Specifically, we have described clear and convincing burden as such:

A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is *"highly probable."*

*Price,* 988 F.2d at 1191 (internal citations omitted) (determining the quantum of proof required to establish priority in an interference proceeding with an issued patent) (emphasis added). "Well-nigh irrefragable" proof similarly refers to evidence that "cannot be refuted or disproved; incontrovertible, incontestable, indisputable, irrefutable, undeniable (said of a statement, argument, etc., or the person who advances it.)" Oxford English Dictionary 93 (2d ed.1991) (defining "irrefragable"). As with the clear and convincing standard, the requirement of "well-nigh irrefragable" proof also sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith:

In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff. Thus, in *Gadsden v. United States,* the court compared bad faith to actions which are "motivated alone by malice." In *Knotts,* the court found bad faith in a civilian pay suit only in view of a proven "conspiracy ... to get rid of plaintiff." Similarly, the court in *Struck Constr. Co. v. United States,* found

bad faith when confronted by a course of Governmental conduct which was "designedly oppressive." But in *Librach,* the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

*Kalvar,* 543 F.2d at 1302 (internal citations omitted); *see also Sanders v. United States Postal Serv.,* 801 F.2d 1328, 1331 (Fed.Cir.1986) (stating that "there is a *strong presumption* in the law that administrative actions are correct and taken in good faith") (emphasis added); *Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578, 1581 (Fed.Cir.1995) (reiterating the principle that "[a] contractor can overcome [the presumption that the government acts in good faith] only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it") (quoting *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982)); *Torncello,* 681 F.2d at 770 (stating "the government ... is assumed always to act in good faith, subject only to an *extremely difficult* showing by the plaintiff to the contrary.") (emphasis added); *Librach,* 147 Ct.Cl. at 612 (stating that "clear evidence to the contrary" is necessary to overcome the presumption in favor of the government).

Based on this well-established precedent, it logically follows that showing a government official acted in bad faith is intended to be very difficult, and that something stronger than a "preponderance of evidence" is necessary to overcome the presumption that he acted in good faith, *i.e.,* properly. This is especially so when, as in this case, years have passed between the occurrence of the underlying facts and the allegation of bad faith.

### Am–Pro's Affidavit

Having clarified the standard of proof needed to overcome the presumption of

good faith, we must now decide whether Am–Pro submitted sufficient evidence to create a genuine issue of material fact about whether its inaction and its release resulted from duress by the government. In other words, we must determine if a reasonable fact finder could find, by clear and convincing evidence, that the CO did not act in good faith.

As stated above, the only evidence Am–Pro offers to support its allegations of duress, i.e., that the CO acted in bad faith, is Brown's affidavit. The affidavit states that "Am–Pro was threatened with the taking of its existing Contract with DOS and a claim for considerable reimbursement if it wished to challenge the Contracting Officer's interpretation of the Contract.... [And the CO] threatened to adversely impact Am–Pro's ability to contract with other agencies of government thereafter." Brown Affidavit at ¶¶ 9, 12. For the reasons discussed below, this affidavit is insufficient to create a genuine issue of material fact. In reaching this decision, we consider multiple factors.

■ First, the affidavit is utterly uncorroborated. See, e.g., Appeal of Starghill Alternative Energy Corp., 98–1 BCA ¶ 29, 708 (1998) (indicating that a lack of "contemporaneous, corroborating proof" that the CO threatened to terminate a contract if the contractor refused to execute a modification supported a finding of no duress). Ordinarily, such an affidavit would probably meet the evidentiary standard needed to avoid summary judgment. Indeed, if this were a typical summary judgment issue, one that did not involve a strong presumption in favor of a particular party, the presence of Brown's affidavit and the CO's sworn denials would create a traditional "swearing contest" and thus be inappropriate for summary disposition. But given the clear and convincing evidence needed to show that the CO acted in bad faith, and given the six years of silence and the involvement of counsel, we hold that Brown's statement alone cannot withstand summary judgment.

Nothing in Brown's affidavit, moreover, suggests that the government "had a specific intent to injure" Am–Pro. Caldwell, 55 F.3d at 1581. And Am–Pro has not alleged that these threats were "motivated alone by malice," Gadsden v. United States, 111 Ct.Cl. 487, 489, 78 F.Supp. 126 (1948); as part of a proven "conspiracy . . . to get rid of [Am–Pro]," Knotts, 128 Ct.Cl. at 500, 121 F.Supp. 630; as part of a course of governmental conduct which was "designedly oppressive," Struck, 96 Ct.Cl. at 222; or as "actuated by animus toward" Am–Pro, Librach, 147 Ct.Cl. at 614.

To the contrary, the CO's course of conduct suggests she acted in good faith. For example, the contract provided for a two-year base period followed by three one-year option periods. Despite Am–Pro's assertions that it was owed additional compensation for breaker hours, the CO nevertheless exercised the option on each of these three years. Further, the CO, on behalf of the government, entered into a second contract with Am–Pro in 1994, when the first contract expired. The CO did not have to take either action and could have instead awarded the contract to another contractor.

Moreover, in determining whether to exercise the options on the first contract, the CO could properly consider the contractor's performance and the other issues that had arisen after the contract's award. One would expect such behavior from a reasonable CO (and, for that matter, a reasonable businesswoman or businessman). The CO had a legitimate concern about the cost of the contract: in her opinion, the contract had been solicited so as to include the cost of breaker hours in the fixed price. Yet Am–Pro later assert-

ed that it was owed separate compensation for these hours, thereby driving up the cost of the contract considerably. The CO candidly explained this to Am–Pro.

Later Am–Pro, as previously noted, alleged that this explanation was actually a threat. But Am–Pro's perception of this explanation as a threat is implausible; rather, the CO's statements appear to reflect normal and appropriate business concerns. In our view, then, Am–Pro faced two alternatives: either file an appeal; or hope that not doing so would help persuade the government to exercise its right to purchase the option years. A reasonable fact finder could only see this as a free choice—an ordinary business decision, not coercion. *See Johnson,* 531 F.2d at 1043 (stating that a "free choice between two courses of action negatives duress."). Am–Pro chose the latter, and it ultimately gained five more years of contracting with the State Department. Am–Pro cannot now plausibly argue that its business choice resulted from duress.

In addition to the uncorroborated nature of Brown's affidavit, other factors support a holding that Am–Pro has failed to create a genuine issue of material fact about whether the release letter and failure to file or complain were the product of duress. Importantly, the affidavit was not prepared until six years after the alleged threats took place. *See Johnson, Drake & Piper, Inc. v. United States,* 209 Ct.Cl. 313, 531 F.2d 1037, 1043 (1976) (stating that where a contractor did not allege duress until 3½ years after its contract work was completed, "a telling indication that no duress was practiced is the long delay before plaintiff spoke out and claimed duress"). Equally significant, the release was prepared by Am–Pro's counsel, as shown by the November 5, 1992, letter that states "I [Am–Pro's president] have contacted our lawyers and directed

them to prepare a document indicating our willingness to terminate all claims for past and present (as associated with this contract) monies related to 'breakers'." Such involvement of counsel during the alleged period of duress similarly has been held to present "compelling evidence that there was no duress in fact." *Id.*

We also find Am–Pro's affidavit insufficient because of its inherent implausibility. Am–Pro's Brown alleged that the CO threatened to cancel the current contract if Am–Pro did not withdraw its 1992 breaker claim. This threat was allegedly first made at the January 1992 meeting, *see* Brown Affidavit at ¶ 9, at which no less than twelve people were present, including Am–Pro's counsel and a representative of the Legal Adviser's Office, *see* Government Minutes of January 9, 1992 Meeting. Yet none of the other eleven people has corroborated this alleged threat.

Corroboration is also lacking for the other two threats Brown alleged the CO made. He alleged that the CO threatened not to exercise the remaining option years under the contract and to "adversely impact Am–Pro's ability to contract with other agencies of government." Brown Affidavit ¶ 12. As discussed earlier, whether the CO was going to exercise the option years under the contract was a business decision that required her consideration of unanticipated and additional expenses, such as for the breaker hours. Such a concern could have legitimately justified a decision not to exercise further options on the contract. Thus, the CO would have had no reasonable motive to issue such a "threat." Finally, Am–Pro's assertion that the CO threatened to effectively exclude Am–Pro from other government contracts is equally implausible. As the CO stated in her affidavit, she "had no authority to impose such a ban." Cain Decl. at ¶ 11.

Am–Pro's belated assertions, with no corroborating evidence, therefore fall short of the "clear and convincing" or "highly probable" (formerly described as "well-nigh irrefragable") threshold. This is especially so because nothing else in the record hints that the CO acted improperly. On the contrary, the contemporaneous documentary record suggests the CO acted in good faith and properly. For example, in view of the dispute regarding breaker hours, the CO issued Modification 22, which provided for temporary payments for breaker hours pending her final interpretation of the contract. Similarly, the CO's candid explanation in her April 8, 1992, letter to Am–Pro that she would need to consider the breaker hours issue in her decision whether to exercise the contract options demonstrates a good faith effort to share her business concerns. On top of that, the CO did extend Am–Pro's contract.

We also view as telling Am–Pro's lack of contemporaneous documentary evidence. Had Brown, or any other Am–Pro representative present when the alleged threats took place, made a notation or some form of contemporaneous record either to Am–Pro's attorneys or simply to Am–Pro's internal files, this might be a different case. A contemporaneous record of the alleged threats would have strengthened the plausibility of Brown's allegations. But when (as here) the only evidence offered by the plaintiff is an uncorroborated and implausible affidavit prepared six years after the underlying facts occurred, and given that the documentary evidence of record, including a release prepared by plaintiff's own counsel, is contrary to this affidavit, we hold that such evidence cannot, as a matter of law, meet the clear and convincing burden of proof necessary to overcome the presumption the government official acted properly and in good faith.

**Conclusion**

For the reasons stated above, we conclude as a matter of law that Brown's affidavit does not constitute clear and convincing proof necessary to overcome the presumption that the CO acted properly and in good faith and that a reasonable fact finder could not find to the contrary. Therefore, Am–Pro has failed to create a genuine factual issue about whether its November 10, 1992, release was procured by duress. The summary judgment of the Court of Federal Claims that the release bars the action Am–Pro brought is therefore

*AFFIRMED.*