ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Lockheed Martin Aeronautics Company | ) | ASBCA Nos. 62249, 62727 |
| | ) | |
| Under Contract No. N00019-02-C-3002 | ) | |

APPEARANCES FOR THE APPELLANT:    John E. McCarthy, Jr., Esq.
　　　　　　　　　　　　　　　　　　Nicole J. Owren-Wiest, Esq.
　　　　　　　　　　　　　　　　　　Jonathan M. Baker, Esq.
　　　　　　　　　　　　　　　　　　Yuan Zhou, Esq.
　　　　　　　　　　　　　　　　　　　Crowell & Moring LLP
　　　　　　　　　　　　　　　　　　　Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Craig D. Jensen, Esq.
　　　　　　　　　　　　　　　　　　　Navy Chief Trial Attorney
　　　　　　　　　　　　　　　　　　David M. Ruddy, Esq.
　　　　　　　　　　　　　　　　　　Thomas G. Radtke, Esq.
　　　　　　　　　　　　　　　　　　　Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE WITWER ON
RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

　　　　These appeals involve a dispute over the scope of the government's license rights in nine items of noncommercial computer software that are part of the verification simulation software for the F-35 Joint Strike Fighter program. Appellant, Lockheed Martin Aeronautics Company (LM Aero or Lockheed), asserts that respondent, the Department of the Navy (Navy), is entitled to specifically negotiated license rights in the software. The Navy counters that it is entitled to government purpose rights.

　　　　The Navy moves for summary judgment in ASBCA No. 62249, contending that LM Aero has failed to meet its burden to justify its asserted restrictions. More specifically, the Navy contends that LM Aero cannot meet its burden to show that the software items are "developed," as that term is defined in the applicable software license rights clause. LM Aero opposes the Navy's motion on the grounds that there are material facts in dispute related to whether the software items are developed by LM Aero. In support of its opposition, LM Aero relies upon several declarations submitted by the individuals responsible for developing and testing the software in dispute. The Navy argues that the Board should afford these declarations no weight because they are not accompanied by contemporaneous, corroborating evidence. The Navy urges the Board to depart from the "garden variety" standard of

review for summary judgment and, instead, to adopt a heightened standard of review. Thus, the central question presented by the Navy's motion is the quantum and character of evidence necessary to establish a genuine dispute of material fact.

After consideration of the parties' respective positions, we decline to impose the heightened standard of review suggested by the Navy. Instead, applying the well-established standard of review for a motion for summary judgment, we conclude that there is a genuine dispute as to whether the nine software items are developed. We further conclude that, even were we to find that the software in question is not developed, the Navy has failed to establish that it is entitled to judgment as a matter of law. Thus, we deny the Navy's motion for summary judgment.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

The following facts are undisputed or uncontroverted, unless stated otherwise.

I.    The Contract

In October 2001, the Navy's F-35 Joint Strike Fighter Program Office (JPO) awarded Contract No. N00019-02-C-3002 to LM Aero for the development of the F-35 Joint Strike Fighter (JSF) Air System (R4, tab 20 at 002783; GSUMF ¶ 1; app. opp'n at 7).[1] The JSF Air System is "a family of multi-role aircraft, and autonomic logistic elements" (app. supp. R4, tab 1 at A_000009). Relevant here, the contract identified various methodologies for verification of the air system requirements, including verification by modeling and simulation (R4, tab 20 at 003947-49; tab 32 at 024936; app. supp. R4, tab 1 at A_000213-15; compl. ¶ 69).[2]

The dispute before us involves certain items of the verification simulation (VSim) software. The VSim software is a simulation model used to test F-35 aircraft design in a simulated environment without having to fly the aircraft. (ASGIMF ¶ 3; GASUMF ¶ 3) The nine items of noncommercial computer software in dispute are: CORE, FusionTech, AlgTech, LM Aero Containers, SimAudio, LabSys_Base, Fifth Generation Simulation Interface (FSI), FSI Test Models, and FSI API documentation (R4, tab 11 at 0001541; compl. ¶ 26; GSUMF ¶ 16).

---

[1] "GSUMF" refers to the Government's Statement of Undisputed Facts dated October 30, 2020. "ASGIMF" refers to Appellant's Statement of Genuine Issues of Material Fact dated February 12, 2021. "GASUMF" refers to the Government's Reply to Appellant's Response to the Government's Statement of Undisputed Facts dated April 2, 2021.

[2] Citations to the complaint and answer are to the pleadings in ASBCA No. 62249.

At the time of contract award, there was no contractual requirement for LM Aero to deliver any portion of the VSim software (compl. ¶¶ 6, 71; answer ¶¶ 6, 71). Thereafter, the Navy sought to amend the contract to require LM Aero to deliver certain software items that LM Aero was developing (compl. ¶ 7; answer ¶ 7). At that point, LM Aero asserted restrictions on the Navy's rights in the requested software, contending that the software was developed exclusively at private expense (*id.*). The Navy disputed LM Aero's asserted restrictions (compl. ¶¶ 7, 78; answer ¶¶ 7, 78).

II.     Software Rights Clauses

The contract incorporated by reference several Department of Defense Federal Acquisition Regulation Supplement (DFARS) data and software rights clauses. Relevant here, the contract incorporated clause 252.227-7014, RIGHTS IN NONCOMMERCIAL COMPUTER SOFTWARE AND NONCOMMERCIAL COMPUTER SOFTWARE DOCUMENTATION (JUN 1995) and ALTERNATE I (JUN 1995), and clause 252.227-7019, VALIDATION OF ASSERTED RESTRICTIONS—COMPUTER SOFTWARE (JUN 1995) (R4, tab 20 at 003061; compl. ¶ 5; answer ¶ 5). Additionally, once a disagreement arose over the rights to the software in question, the parties modified the contract to incorporate an additional clause, titled VSIM SOFTWARE LICENSE RIGHTS (DEVIATION 2017-N0001 TO DFARS 252.227-7014 AND DFARS 252-227.7019) (R4, tab 11 at 001541; compl. ¶ 8; answer ¶ 8). The parties refer to this as the "H-40" clause.

Through the H-40 clause, the parties modified the contract to include specifically negotiated license rights and specialized challenge procedures for the nine items of VSim software at issue here (R4, tab 11 at 001541-43).[3] Because the license rights granted to the Navy and the specialized challenge procedures deviate from the requirements of DFARS clauses 252.227-7014 and 252.227-7019, the Navy obtained an individual DFARS deviation, Deviation 2017-N0001, dated January 2, 2018 (R4, tab 11 at 001541, 001543; tabs 52-54).

The license rights granted to the Navy through the H-40 clause include restricted rights, as defined by DFARS 252-227-7014(a)(14), subject to additional limitations (R4, tab 11 at 001542-43). The additional limitations, which are delineated in the H-40 clause, are not relevant to our resolution of the pending motion. The rights granted under the H-40 clause are premised on LM Aero's assertion that the nine items

---

[3] Although the H-40 clause contains the phrase "Specially Negotiated License Rights," we believe this to be a typographical error and that the contract should read "Specifically Negotiated License Rights," which is the category of rights set forth in the DFARS provision referenced in the H-40 clause (R4, tab 11 at 001542 (referencing DFARS clause 252.227-7014(b)(4)).

of VSim software were "developed exclusively at private expense" and conditioned on the Navy's validation of this assertion (*id.* at 001541-42, 001545).

As noted above, the H-40 clause also included specialized challenge procedures that deviate from the challenge procedures of DFARS clause 252.227-7019 (R4, tab 11 at 001543). Among other things, the specialized procedures required LM Aero to furnish or make available with 30 days "all records sufficient to justify the assertions that the Software was developed exclusively at private expense" (*id.*). The records were to be provided to the Defense Contract Audit Agency (DCAA), the Defense Contract Management Agency (DCMA), or equivalent audit agency (*id.*), who was required to issue an audit report (*id.*).[4]

III.     Audit and the Contracting Officer's Final Decision

In May 2018, the contracting officer initiated a challenge to LM Aero's assertion that the software was developed at private expense (R4, tab 10; GSUMF ¶ 20; app. opp'n at 2; compl. ¶ 82; answer ¶ 82). The Navy subsequently designated DCAA to be the lead audit agency (R4, tab 13 at 001593; compl. ¶ 82; answer ¶ 82).

Over the course of the next year, the government and LM Aero engaged in various communications regarding LM Aero's assertion that the software was developed exclusively at private expense (R4, tabs 14-14.4, 19, 21-22, 24-25, 28; app. supp. R4, tabs 3-37; GSUMF ¶¶ 22-37; app. opp'n at 31-50). The parties do not dispute that, during this period, LM Aero provided records to the government (GSUMF ¶¶ 22-23; app. opp'n at 3; ASGIMF ¶¶ 22-23). Instead, the parties dispute whether LM Aero complied with the requirement of the H-40 clause to furnish or otherwise make available "all records sufficient to justify the assertions that the Software was developed exclusively at private expense" (R4, tab 11 at 001543; *see also* gov't mot. at 37-38, 43-44; app. opp'n at 3; compl. ¶ 84; answer ¶ 84).

In the end, DCAA's audit was inconclusive. In its May 2019 report, DCAA stated that it was "unable to obtain sufficient and appropriate evidence to form an opinion as to whether the development of the subject [software] was accomplished exclusively at private expense" (R4, tab 29 at 008693). In August 2019, the Navy contracting officer issued a final decision, concluding that LM Aero had failed to justify its asserted restrictions (R4, tab 32 at GOV24948; GSUMF ¶¶ 39, 41; app. opp'n at 51-52). The contracting officer further concluded that the Navy was

---

[4] The H-40 clause has limited bearing on our decision here because the H-40 clause does not alter the definition of the term "developed" as set forth in DFARS clause 252.227-7014(a)(6), and, as noted, the definition of developed forms the basis of our decision today. For that reason, we focus our attention primarily on the DFARS software license clauses incorporated into the contract.

entitled to government purpose rights in the software (R4, tab 32 at GOV24948; GSUMF ¶ 41; app. opp'n at 52).

LM Aero appealed the decision to the Board in October 2019. We docketed the appeal as ASBCA No. 62449. The appeal docketed as ASBCA No. 62767 was filed in November 2020 and involves a government claim for the reimbursement of $13 million in licensing fees. The Navy has not moved for summary judgment in ASBCA No. 62767.

DECISION

I.      Standards for Summary Judgment

Summary judgment is proper when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if it might affect the outcome of the case under the governing law, and a dispute is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding summary judgment motions, the Board does not resolve controversies, weigh evidence, or make credibility determinations. *Conquistador Dorado Joint Venture*, ASBCA No. 60042, 20-1 BCA ¶ 37,628 at 182,678 (citing *Liberty Lobby*, 477 U.S. at 255).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Mere denials or conclusory statements are insufficient" to ward off summary judgment. *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002).

II.     Applicable Law

Before delving into the relevant DFARS provisions, we must first note that, unlike rights in technical data, which are set forth in 10 U.S.C. § 2320 (2020), *redesignated as* 10 U.S.C. §§ 3771-3775 (2021),[5] there is no corresponding statute

---

[5] Computer software is specifically excluded from the definition of technical data that applies to this statute. 10 U.S.C. § 2304(a) (2020), *redesignated as*, 10 U.S.C. § 3013 (2021).

governing what rights the government may obtain in computer software. Thus, we proceed directly to the regulations. We will return later to the statutory authority for rights in technical data as it has some relevance to our analysis of the pending motion. But, for the moment, we proceed to the applicable regulations.

A.  Categories of License Rights

DFARS clause 252.227-7014 establishes four categories of license rights in noncommercial computer software:  unlimited, restricted, government purpose, and specifically negotiated. DFARS 252.227-7014(b). For the sake of brevity, we refer to this clause as the -7014 clause, where appropriate. As a general matter, the scope of the license rights acquired by the government under the -7014 clause is determined by the source of funds used for the development of the software. DFARS 227.7203-4(a)

If the software is developed exclusively with government funds, the government receives unlimited rights and may use, modify, reproduce, release, perform, display, or disclose the software, in whole or in part, to anyone and for any purpose. DFARS 252.227-7014(a)(15), (b)(1). If the software is developed exclusively at private expense, the government receives restricted rights, which include, among other things, the right to use the software on one computer at a time, to make minimum copies for backup, to modify the software only for the government's own use or backup, and to disclose the software to other contractors or subcontractors only in certain limited situations. DFARS 252.227-7014(a)(14), (b)(3). If the software is developed with mixed funding (*i.e.*, with both government and private funding), the government receives government purpose rights for a five-year period or other negotiable period and may use, modify, reproduce, release, perform, display, or disclose the software within the government without restriction and may release or disclose the software outside the government only for government purposes. DFARS 252.227-7014(a)(11), (b)(2). After expiration of the five-year period or negotiated period, government purpose rights revert to unlimited rights. DFARS 252.227-7014(b)(2)(ii).

The final category—specifically negotiated license rights (SNLR)—can be employed in any of the three funding scenarios discussed above. DFARS 252.227-7014(b). The specific rights afforded to the government are flexible and determined through the mutual agreement of the parties, except that SNLR may not be more restrictive to the government than are restricted rights. DFARS 252.227-7014(b)(4)(i). Any SNLR agreed to by the parties must be identified in a license agreement made part of the contract. DFARS 252.227-7014(b)(4)(ii). Here, as reflected in the H-40 clause, the parties agreed to SNLR for the nine items of computer software and the rights negotiated by the parties are premised on LM Aero's assertion that the software was developed exclusively at private expense (R4, tab 11 at 001541, 001545).

6

B. Definition of "Developed Exclusively at Private Expense"

The phrase "developed exclusively at private expense" is a term of art defined in the DFARS. Specifically, the -7014 clause provides:

> Developed exclusively at private expense means
> development was accomplished entirely with costs charged
> to indirect cost pools, costs not allocated to a government
> contract, or any combination thereof.

DFARS 252.227-7014(a)(7). The term "developed" is also defined in the DFARS clause. For computer programs and software, developed is defined as follows:

> Developed means that—
>
> (i) A computer program has been successfully operated in a computer
> and tested to the extent sufficient to demonstrate to reasonable persons
> skilled in the art that the program can reasonably be expected to
> perform its intended purpose;
>
> (ii) Computer software, other than computer programs, has been tested
> or analyzed to the extent sufficient to demonstrate to reasonable
> persons skilled in the art that the software can reasonably be expected
> to perform its intended purpose[.]

DFARS 252.227-7014(a)(6)(i)-(ii).[6]

C. Burden of Proof

In *Cubic Defense Applications, Inc.*, we held that the contractor bears the burden of proof to justify its asserted restrictions. Our decision provides, as follows:

> In requiring a contractor or subcontractor to furnish
> "written justification" for a restriction asserted on [the] use

---

[6] The Navy asserts that LM Aero has never indicated whether it considers the nine VSim items in dispute to be computer programs or software (gov't mot. at 36 n.10; gov't reply at 5 n.5). LM Aero does not respond to this assertion in its opposition. We observe, however, that in LM Aero's complaint and opposition to the Navy's motion, it refers to the items almost exclusively as software (*see e.g.*, compl. ¶ 26; app. opp'n at 2-3). Thus, we conclude that LM Aero views the items in dispute to be computer software. In any event, the distinction is not relevant for our purposes here.

of noncommercial data or software furnished pursuant to a contract and specifying the contractor's written submittal will be treated as a "claim" under the [Contract Disputes Act], Congress clearly placed the burden of proof for validating a use or release restriction on a contractor or subcontractor and established that the "validation" of such restrictions under contracts subject to 10 U.S.C. § 2321 containing a DoD "validation" clause, as here, constitutes a "claim" by a contractor under the CDA.

ASBCA No. 58519, 18-1 BCA ¶ 37,049 at 180,371.

In reaching this conclusion, we relied, in part, on 10 U.S.C. § 2321 (since redesignated) and DFARS clause 252.227-7037, VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA (SEP 1999)—neither of which applies to computer software. *Cubic Def. Applications, Inc.*, 18-1 BCA ¶ 37,049 at 180,371, 180,375. Nevertheless, DFARS clause 252.227-7019, which applies to computer software and which is incorporated into this contract, largely imposes the same requirements as 10 U.S.C. § 2321 and DFARS clause 252.227-7037 and supports our continued holding that the burden of proof is on the contractor. DFARS 252.227-7019(b) (requiring the contractor to maintain records sufficient to justify the validity of its asserted restrictions and to be prepared to furnish a written justification for those restrictions).[7] Thus, LM Aero bears the burden to demonstrate that the software in question was developed exclusively at private expense.

III.    Parties' Contentions

The Navy's motion for summary judgment is premised on the straightforward notion that LM Aero cannot meet its burden to justify its asserted restrictions. The Navy contends that LM Aero has not demonstrated that the software at issue is "developed," as that term is defined in DFARS clause 252.227-7014(a)(6) (gov't mot. at 2). The Navy further contends that, because LM Aero cannot show that the software is developed, the Board should grant judgment in favor of the Navy and invalidate LM Aero's asserted restrictions on the government's license rights (*id.*). The Navy does not move for summary judgment on the issue of whether the development of the software was funded exclusively at private expense, *i.e.*, the financial element of LM Aero's burden (gov't mot. at 3; GASUMF ¶ 3).[8]

---

[7] The H-40 clause imposes similar requirements. R4, tab 11 at 001543-44.

[8] The Navy's opening motion raised several issues for the Board's resolution. In its reply brief, however, the Navy represented that resolution of its motion had been narrowed to a "sole question," namely "whether Lockheed under the

8

In opposing the Navy's motion, LM Aero argues that there is a triable issue of fact as to whether the nine items of software are developed. For support, LM Aero relies on declarations submitted by the software engineers, project leads, and system architects responsible for developing and testing the software. The declarants describe the tests and analyses they conducted to ensure that the software could reasonably be expected to perform its intended purpose.

For the most part, the Navy does not contend that the declarations submitted by LM Aero fail to meet the evidentiary standards upon which the Board typically relies in deciding motions for summary judgment. Instead, the Navy advocates for a different standard. The gravamen of the Navy's argument is that the Board should impose a heightened standard to establish disputed material facts. More precisely, the Navy argues that the Board should impose a "corroboration requirement" requiring the production of contemporaneous evidence of development (gov't reply at 3).

We find the Navy's argument to be misplaced and unpersuasive. In the subsequent analysis, we first address whether LM Aero has put forth sufficient evidence under the well-established standard of review to demonstrate that there is a genuine dispute of material fact. Next, we address the Navy's argument for a heightened standard of review. Finally, we address whether the Navy is entitled to judgment as a matter of law even assuming, for the sake of argument, that we were to adopt the Navy's proposed standard.

IV.     Under Well-Established Standards for Summary Judgement, There is a Genuine Dispute of Material Fact as to Whether the Software Items Are Developed, Which Precludes our Granting the Navy's Motion.

After reviewing the parties' respective arguments and the evidence submitted, the Board finds that LM Aero has put forth sufficient evidence in the form of declarations to raise a triable issue of fact, namely whether the software items are developed.

A.  LM Aero has Presented Declarations Supporting a Finding That the Software is Developed.

Under our Board rules, we look to Rule 56 of the Federal Rules of Civil Procedure (FED. R. CIV. P.) for guidance when considering motions for summary judgment. Board Rule 7(c)(2); *Conquistador Dorado Joint Venture*, 20-1 BCA ¶ 37,628 at 182,678. On the subject of declarations, Rule 56 provides that "[a]n

proper legal interpretation of 'developed' under DFARS 252.227-7014(a)(6) has failed to meet its burden of proof to justify the use and release restrictions asserted for the challenged software at issue" (gov't reply at 3).

9

affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). The declarations submitted by LM Aero meet the criteria under Rule 56 to oppose a motion for summary judgment. The declarations are made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarants are competent to testify on the matters stated.

As a representative example, LM Aero submitted a declaration from James Gibbs, a software engineer with LM Aero's Integrated Avionics Performance Prediction and Analysis (IAPPA) internal development team (app. opp'n, ex. E, Gibbs decl.). Mr. Gibbs states in his declaration that he has served in this role since 2002 (*id* ¶ 1). Mr. Gibbs further states that, in this role, he is "responsible for software development under IAPPA, and was the primary author of IAPPA's LM Aero software library (also referred to as the 'LM Aero Containers' software library)" (*id.*)—one of the disputed items of software in these appeals. Mr. Gibbs describes the general nature and functionality of the LM Aero Containers software library (*id.* ¶ 2), and asserts that "[a]s part of [the] development process," he personally tested the software "after writing the source code in order to confirm that the software would perform as intended" (*id.* ¶ 4). More specifically, Mr. Gibbs asserts that he "conducted unit testing, which included writing code to run the standalone LM Aero software library pieces" so that he "could confirm functionality of key capabilities" (*id.*). Mr. Gibbs contends that he conducted this testing "prior to IAPPA's first release of the LM Aero software library" (*id.* ¶ 5).

Mr. Gibbs also describes the "iterative process" for testing subsequent releases of the software. Specifically, Mr. Gibbs contends that, over the past 17 years, "the software has been incrementally developed and released as different versions (or 'builds'), each with unique and/or undated software capabilities" (*id.* ¶ 6). Mr. Gibbs states that, prior to the release of each build, he "develop[ed] the software and conduct[ed] unit testing of all source code that [he] author[ed]" (*id.*). Additionally, he states that, "when it is time to release the software, [he] prepared the written and tested LM Aero software library for release" (*id.*). Mr. Gibbs contends that, "[b]ased on this testing, [he] confirmed that the LM Aero software library developed for each release would function as intended to the best of [his] knowledge and belief" (*id.*). Mr. Gibbs states that, as a final step, his Project Lead would run "additional testing to ensure all the software for that particular release would perform as intended" (*id.*). As Mr. Gibbs explains, "[a]fter my Project Lead's testing was concluded and it was confirmed that the software would perform as intended, the software was released and made available to the LM Aero programs" (*id.*).

In conclusion, Mr. Gibbs states that, "[f]rom his perspective as the software developer, the LM Aero software library at issue was entirely developed, tested, and

validated to work as intended, namely to meet its requirements, by the time the IAPPA team released the software for use by the airframe programs, such as the F-35 program" (*id.* ¶ 7). To support this statement, Mr. Gibbs points out that "the LM Aero library has been in use continually on the F-35 program for over a decade" (*id.*).

   B. <u>LM Aero's Declarations are Sufficient to Preclude Summary Judgment.</u>

   We conclude that the declaration of Mr. Gibbs is based upon personal knowledge, sets out facts that would be admissible in evidence, and demonstrates his competence to testify as to the matters described therein. Accordingly, we find the declaration of Mr. Gibbs meets the criteria under Rule 56 to oppose a motion for summary judgment. We also find the declaration of Mr. Gibbs to be representative of the other declarations submitted by LM Aero describing software developmental work (*see* app. opp'n, exs. F-I).[9]

   As noted previously, the gravamen of the Navy's argument is that we should depart from the "garden variety" standard of review for summary judgment and, instead, to adopt a heightened standard of review. That said, the Navy also briefly attacks the submitted declarations under the well-established, "garden variety" standard of review (gov't mot. at 33-35; gov't reply at 21). In this regard, the Navy alleges that the declarations are conclusory because they "provide no concrete dates asserting when testing occurred, who else witnessed the tests, and provide no details as to the parameters, scope, or results of any such tests" (gov't reply at 21).

   As an initial matter, we do not entirely agree with the Navy's characterization of the contents of the declarations. Even if we did, however, we find that the declarations set forth sufficient facts to defeat the Navy's summary judgment motion. "It is well settled that a 'conclusory statement on the ultimate issue does not create a genuine issue of fact." *Applied Cos. v. United States*, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (internal citation omitted). *See also CLC Constr. Co.*, ASBCA No. 59110, 20-1 BCA ¶ 37,584 at 182,493 ("A nonmoving party may not simply rest upon vague allegations of disputed facts in opposing summary judgment."). Instead, the nonmoving party "must demonstrate that evidentiary conflicts exist on the record as to

---

[9] In addition to the declarations submitted by LM Aero with its opposition, LM Aero also relies upon declarations it submitted in 2018 as part of the DCAA audit. *See* R4, tabs 14-14.4. Although these declarations were not submitted for the sole purpose of establishing a genuine dispute of material fact as to whether the software is developed, they supply relevant details regarding development. As an example, Daryl Marling, a Project Lead and Lead Technical Engineer responsible for the development of the IAPPA team's noncommercial computer software, including some of the software in dispute here, provides details regarding the dates of development (R4, tab 14.4 at 2495-97, Marling Decl.).

11

material facts at issue." *Id.* (citing *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149 (Fed. Cir. 1986)) (other citations omitted).

Here, the declarants provide more than a mere opinion on the ultimate issue in this appeal. Rather, they describe the software in question and the testing they performed to assure themselves that the software performed as intended. Despite the Navy's demand for additional details, LM Aero, as the nonmoving party, is not required at this stage to present its entire case in response to a summary judgment motion to avoid defeat. *CLC Constr. Co.*, 20-1 BCA ¶ 37,584 at 182,493. Moreover, we are not persuaded that certain details, such as concrete dates and/or substantiating witnesses, are required for LM Aero to meet its burden to establish that the software is developed. Hence, we are not convinced such facts are material.

As it must, the Board draws all justifiable inferences in favor of LM Aero as nonmovant for this motion. Consequently, we conclude there is a genuine dispute of material fact as to whether the software items are developed that precludes granting summary judgment.[10]

V.     The Navy Provides No Basis to Depart from the Well-Established Standard of Review for Summary Judgment.

The crux of the Navy's argument is that the submitted declarations, without more, are insufficient to establish a disputed material fact regarding whether the nine items of noncommercial computer software are developed, as that term is defined in the -7014 clause (gov't reply at 3). The Navy argues that the Board should impose a heightened standard on LM Aero to establish disputed material facts regarding this issue, namely a "corroboration requirement" requiring the production of contemporaneous, corroborating documentary evidence of development to support the submitted declarations (*id.* at 3). The Navy, however, does not cite any binding

---

[10] The Navy also raises an "alternative, secondary basis" to support summary judgment, namely that we should find that LM Aero breached the H-40 clause of the contract by not producing all records sufficient to justify the assertion that the software was developed exclusively at private expense (gov't reply at 2 n.2, 16-17; gov't mot. at 43-44). As a remedy for breaching this clause, the Navy argues that we should impose an evidentiary sanction—we should prohibit LM Aero, in opposing summary judgment, from relying on any document not produced during the DCAA audit (gov't reply at 17). This would include the declarations on which LM Aero relies to establish disputed material facts. There are numerous flaws with this argument. Most importantly, the Navy has moved for summary judgment in ASBCA No. 62249, which does not involve a government claim for breach of contract. Thus, the Navy's argument requires us to examine claims not properly before us in this matter.

12

authority requiring the Board to do so.  Rather, the Navy seeks to import patent law concepts and standards into our analysis of whether declarations are sufficient to defeat motions for summary judgment in this context (gov't mot. at 33-35).[11]

More precisely, the Navy urges the Board to construe the term "developed" in the -7014 clause as requiring "actual reduction to practice"—a term of art used to establish an inventor's priority rights under the patent laws.  Assuming we were to do so, the Navy next urges us to adopt the attendant corroboration requirement the Navy asserts the Federal Circuit has imposed in patent priority disputes.  (*Id.* at 33-34 (citing *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006); *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 74 (Ct. Cl. 1977))).  The Navy explains that construing the term developed in this manner and adopting the "corroboration case law" is what "differentiates this case from a garden variety summary judgment,

---

[11] The only non-patent law decisions of any note cited by the Navy are *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002), and *Exceed Resources, Inc.*, ASBCA No. 61652, 20-1 BCA ¶ 37,634 (gov't reply at 27-28).  These decisions emphatically do not stand for the Navy's stated proposition.  In both cases, the contractor executed a release and then years later contended, in an uncorroborated affidavit, that the contracting officer (CO) used threats to force the contractor to sign the release.  In *Am-Pro Protective Agency*, the Federal Circuit held that, while an uncorroborated affidavit would have been enough in an ordinary case to create a dispute of facts, it was not sufficient under the circumstances presented due to the high standard of proof necessary to show bad faith, *i.e.*, clear and convincing evidence.  *Am-Pro Protective Agency, Inc.*, 281 F.3d at 1241 ("Ordinarily, such an affidavit would probably meet the evidentiary standard needed to avoid summary judgment.  Indeed, if this were a typical summary judgment issue, one that did not involve a strong presumption in favor of a particular party, the presence of [the contractor's] affidavit and the CO's sworn denials would create a traditional 'swearing contest' and thus be inappropriate for summary disposition.").  The Federal Circuit found the contractor's affidavit insufficient due to the high standard of proof necessary to show bad faith, the uncorroborated nature of an allegation made years later, the inherent implausibility of the allegations, and the lack of contemporaneous documents recording the alleged threat.  *Id.* at 1238-39, 1241-43.  Relying upon the Federal Circuit's decision, we reached the same conclusion under similar facts in *Exceed Resources, Inc.*  LM Aero's appeals, however, do not involve allegations of bad faith.  Nor is there a strong presumption in favor of a particular party or undisputed evidence rendering the testimonial evidence utterly implausible.  Rather, to employ the Federal Circuit's terminology, the matter before us is "a typical summary judgment issue."

13

whereby a declaration, even without more, is sufficient to generate an issue of material fact" (gov't reply at 3).

LM Aero counters that *de facto* rejection of testimonial evidence ignores the Board's own rules, which expressly contemplate that, in opposing a motion for summary judgment, parties may rely upon affidavits and declarations (app. opp'n at 84 (citing Board Rule 7(c)(2))). LM Aero also argues that the reduction to practice cases involving patent priority disputes are irrelevant because they pertain to different statutory and regulatory requirements than those at issue in this appeal (*id.*). In this respect, LM Aero points out that the reduction to practice cases stem from statutory requirements in patent law that require an invention to be novel before a patent may be granted. (*Id.* (citing *BASF Corp. v. SNF Holding Co.*, 995 F.3d 958, 964 (Fed. Cir. 2020)). LM Aero asserts that the statutory and regulatory requirements pertaining to rights in technical data and computer software do not contain any novelty requirement. (*Id.* at 84-85 (citing 10 U.S.C. §§ 2320-2321 (2020), *redesignated as* 10 U.S.C. §§ 3771-3775, 3781-86 (2021))); DFARS 252.227-7013 (JUN 1995); DFARS 252.227-7014 (JUN 1995)). Further, LM Aero points out that the DFARS clause for noncommercial technical data, DFARS clause 252.227-7013, explicitly rejects the concept of reduction to practice (*id.* at 85).

Finally, LM Aero argues that *de facto* rejection of testimonial evidence would be unfair and misplaced in the context of a data or software rights dispute because the contractor has no obligation to maintain records of development unless and until the computer software is identified as a deliverable (*id.* at 86). As a result, LM Aero contends that it was not required to maintain records until May 2018, when the software became a deliverable under the contract here (*id.*). This date, according to LM Aero, was long after the software items were developed (*id.*).[12]

---

[12] Despite LM Aero's contention that it was not required to maintain corroborating records, it alleges that it possesses source code and related technical documentation, including testing documentation, that would corroborate the evidence proffered in the declarations (app. opp'n at 67). LM Aero, however, did not provide this material to the Board in support of its opposition. Instead, LM Aero asserts that such highly confidential material can only be produced subject to enhanced protections and blames the Navy for the parties' failure to negotiate a mutually agreeable addendum to the protective order (*id.* at 85 n.10, 88 n.12). To the extent LM Aero thought such material necessary to defeat the Navy's motion, it should have moved for an addendum to the protective order while opposing the Navy's motion. Instead, it did not move for an addendum until months after the conclusion of briefing. In its motion for an addendum, LM Aero did not seek leave to supplement its opposition to the Navy's motion. It is well settled that promises of future evidentiary proof are insufficient to avoid summary judgment. *See e.g., Maldonado-Denis v. Castillo-Rodriguez,*

We find that the Navy's arguments provide no basis for the Board to depart from the ordinary standards for summary judgment in this context. As we explain below, the plain language of the -7014 clause, incorporated into the contract, does not require that computer software be developed to the point of actual reduction to practice. Moreover, even if we were to rely on the patent law concept of reduction to practice to define the term developed, the attendant corroboration requirement imposed in patent priority disputes exists primarily to prevent inventors from perpetrating fraud. The Navy fails to convince us that similar concerns exist here.

A. The Contract Does Not Require Development to the Point of Actual Reduction to Practice.

Contract interpretation is a matter of law. *The Boeing Co.*, ASBCA No. 60373, 18-1 BCA ¶ 37,112 at 180,624. In interpreting a contract, we begin with the plain language of the contract. *Id.* (citing *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004)). If the contract language is clear and unambiguous, the plain language controls, and extrinsic evidence is not allowed to contradict the plain language. *ECC Int'l Constructors, LLC*, ASBCA No. 59138, 19-1 BCA ¶ 37,281 at 181,387 (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003)). Here, we find that the plain language of the contract is clear and unambiguous. Thus, our inquiry ends and the plain language of the contract controls. *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002).

1. The Plain Language of the Contract Does Not Require Actual Reduction to Practice.

The contract here incorporates DFARS clause 252.227-7014 (R4, tab 20 at 003061). In defining the term "developed," the plain language of the -7014 clause does not require that computer software be developed to the point of actual reduction to practice. *See* DFARS 252.227-7014(a)(6)(ii). Rather, it requires that the software "has been tested or analyzed to the extent sufficient to demonstrate to reasonable persons skilled in the art that the software can reasonably be expected to perform its intended purpose." *Id.*

---

23 F.3d 576, 581 (1st Cir. 1994) (holding that "motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal"); *Walston v. Baldwin*, No. 16-884, 2020 WL 2086846 at *4 (S.D. Ill. Apr. 30, 2020) (concluding that "[t]he nonmovant must identify record evidence (not future evidence) to create a genuine dispute of material fact and stave off summary judgment") (citation omitted). Therefore, we afford no weight to LM Aero's claims about what such evidence might demonstrate.

The Navy acknowledges the plain language of the clause (gov't reply at 11-12), and does not argue that the contract language is ambiguous. Nevertheless, the Navy asserts that we should read in a requirement for actual reduction to practice (*id.* at 6-13; gov't mot. at 24-27). Having failed to argue, much less establish, that the contract language is ambiguous, the Navy's assertion that we should include language that is not present is improper.

### 2. The Navy's Efforts to Go Beyond the Plain Language of the Contract Are Unavailing.

To justify reading in a reduction to practice test, the Navy points to our seminal data rights decision, *Bell Helicopter Textron*, ASBCA No. 21192, 85-3 BCA ¶ 18,415, in which the Navy claims we relied upon patent law concepts to interpret the term developed (gov't mot. at 26, 34; gov't reply at 3, 6, 7-10).[13] The Navy also points to the regulatory history of the -7014 clause to support its argument that proof of reduction to practice is required to establish development (gov't mot. at 25-26, 34; gov't reply at 7, 11-13). Finally, the Navy argues that the canon of construction known as *expressio unius est exclusio alterius* compels us to read in a reduction to practice test. None of these arguments are convincing.

### a. The Board, in *Bell Helicopter Textron*, Rejected Adopting a Requirement to Demonstrate Actual Reduction to Practice.

The Navy's reliance upon *Bell Helicopter Textron* is misplaced. In our decision, we explicitly rejected the argument advanced by the Navy here. The contract at issue in *Bell Helicopter Textron* contained a data rights clause that was a predecessor to the DFARS clauses at issue here. More specifically, the contract contained Armed Services Procurement Regulations (ASPR) 7-104.9(a), RIGHTS IN TECHNICAL DATA (AUG 1969). This clause, like those that preceded it, used, but did not define, the term developed. Thus, the definition of the term was before us for interpretation. In our decision, we discussed, but ultimately rejected, adopting the patent law concept of actual reduction to practice in construing the meaning of the term in the context of the ASPR clause. *Bell Helicopter Textron*, 85-3 BCA ¶ 18,415 at 92,421-23, 92,434. *See also FlightSafety Internat'l, Inc.*, ASBCA No. 62659, slip op. at 35 (Nov. 29, 2022).

---

[13] The Navy relies on other decisions (gov't mot. at 26 n.6; gov't reply at 10). These decisions, however, are cases in which a court applied the patent law concept in patent law litigation. Thus, they are not relevant to our analysis of the term developed in the context of data and software license rights.

16

In our decision, we noted that the ASPR originally housed the patent rights and data rights provisions in the same standard clause, but then separated the provisions and the ASPR Committee repeatedly rejected adopting the patent law concept in the context of data rights. *Id.* at 92,422 ("[T]he ASPR Committee could easily have adopted language such as 'developed at private expense to the point of actual reduction to practice' as the criterion for limited rights, but did not."); *id.* at 92,423 ("In short, it was understood that if an invention had been 'actually reduced to practice,' then it had also been 'developed,' but the converse was not necessarily true."); *see also id.* at 92,422 (observing that the ASPR Technical Data Subcommittee, in addressing comments regarding a previously proposed definition of the phrase "developed at private expense," expressly agreed that "developed" was "[n]ot intended to be the same as 'reduction to practice'"). After concluding that the regulatory development of the ASPR clause rejected the patent law concept of actual reduction to practice (*id.* at 92,421-23, 92,434), we too rejected the concept in defining the term developed.

Specifically, after explaining that the term developed included concepts of "practicability, workability, and functionality," we included the following caveat:

> All "development" of the item or component need not be 100 percent complete, and the item or component need not be brought to the point where it could be sold or offered for sale. An invention which has been "actually reduced to practice" under patent law has been "developed," but the converse is not necessarily true in every case.

*Id.* at 92,434. We further observed that, although "our construction of the term 'developed' is quite close to the classic patent law concept of 'actual reduction to practice,' and indeed in many fact situations, the two concepts might be identical[,] . . . [w]e do not hold, however, that 'developed' and 'actually reduced to practice' are necessarily identical concepts in every case." *Id.* at 92,422.

In sum, our decision in *Bell Helicopter Textron* is inapplicable because we were interpreting the term developed in the context of an ASPR provision pertaining to technical data that did not provide an express definition of the term. Here, of course, we are interpreting the term developed in the context of a DFARS provision pertaining to software that provides an express definition. In any event, *Bell Helicopter Textron* evidences a clear refusal to construe developed as requiring actual reduction to practice. For this reason, we find the Navy's reliance on our decision to be misplaced, to say the least—especially since the Navy did not address or even acknowledge those portions of our decision in which we expressly rejected adopting the patent law concept.

b. The Regulatory History of the 1995 DFARS Provisions
Demonstrates Rejection of Actual Reduction to Practice.

The second argument advanced by the Navy is that the regulatory history of the 1995 DFARS provisions supports its position that a reduction to practice test should be read into the definition of developed (gov't reply at 7, 11-13). To be clear, because the meaning of the text of the -7014 clause is plan and unambiguous, we need not accept the Navy's invitation to consider the regulatory history. *See e.g., N.L.R.B. v. SW General, Inc.*, 137 S.Ct. 929, 941-42 (2017). But, even were we to do so, we would reach the same conclusion.

By way of background, the ASPR clause at issue in *Bell Helicopter Textron* was a predecessor to the -7014 clause at issue in this appeal, as well as the DFARS clause applicable to noncommercial technical data, DFARS 252.227.7013, RIGHTS IN TECHNICAL DATA—NONCOMMERCIAL ITEMS (JUN 1995). For the sake of brevity, we refer to this latter clause as the -7013 clause, where appropriate. These DFARS provisions were issued in June 1995, almost a decade after *Bell Helicopter Textron*. 60 Fed. Reg. 33,464 (June 28, 1995). In our recent decisions, *Cubic Def. Applications, Inc.*, ASBCA No. 58519, 18-1 BCA ¶ 37,049, and *FlightSafety Internat'l, Inc.*, ASBCA No. 62659, slip op. (Nov. 29, 2022), we recount, in detail, the statutory and regulatory history leading to these DFARS provisions. We examine here those aspects of the history relied upon by the Navy and relevant to its arguments. What our examination reveals is that the patent law concept of actual reduction to practice was well-known at the time the regulatory definition was drafted and, yet, despite this awareness, the drafters of the -7014 clause chose not to require actual reduction to practice. Thus, we conclude that the omission of the patent law test was intentional.

i. Congressional Calls for a Regulatory Definition

In 1986, the year after our decision in *Bell Helicopter Textron*, Congress amended 10 U.S.C. § 2320, the statutory provision pertaining to rights in technical data, directing the Secretary of Defense to issue regulations defining the terms "developed," "exclusively with Federal funds," and "exclusively at private expense." Pub. L. No. 99-661, 100 Stat. 3949, 3951 (Div. A, Title IX, Part A, § 953(a)) (Nov. 14, 1986) ((*codified at* 10 U.S.C. § 2320(a)(1), (3), *redesignated as* 10 U.S.C. § 3771(a)(1), (c)). The legislative history of the 1986 amendments demonstrates that the patent law concept of reduction to practice was considered overly restrictive in the context of data rights.

Specifically, the conference report states that, although "some flexibility in defining terms is necessary, the conferees believe that a statement of congressional

18

intent is appropriate." H.R. Rep. No. 99-1001, at 511 (1986 Conf. Rep.). The adopted statement of congressional intent provides, in relevant part:

> The conferees believe that previously proposed Department of Defense regulations published for public comment on September 10, 1985, defined the term "developed" in an excessively stringent manner by requiring an "actual reduction to practice"—a term of art used to establish an inventor's priority rights under the patent laws.

*Id*. Thus, Congress itself did not believe that a contractor needed to demonstrate actual reduction to practice to establish development. Although the Navy in its briefing discusses the legislative history accompanying the 1986 amendments (gov't reply at 12), the Navy noticeably fails to address or acknowledge the conferees' statement of congressional intent.

### ii. 807 Committee Report and Recommendations

In response to the 1986 amendments, the Department of Defense (DoD) issued a series of draft and interim rules, *see Cubic Def. Applications, Inc.*, 18-1 BCA ¶ 37,049 at 180,364-65, prompting Congress, once again, to weigh in. In section 807 of the National Defense Authorization Act (NDAA) for Fiscal Years 1992 and 1993, Congress tasked the Secretary of Defense to form a joint government-industry advisory committee that would finally implement the requirements of 10 U.S.C. § 2320 and recommend regulations to supersede the interim regulations. NDAA, FY 1992 and 1993, Pub. L. No. 102-190, 105 Stat. 1290, 1421-23 (Div. A, Title VIII, Part A, Sec. 807) (1991). The Navy and other sources refer to this committee as the 807 Committee. We adopt that nomenclature here.[14]

As required by section 807, the committee was composed of industry members representing developers of military equipment and suppliers of spare parts, as well as government members and representatives of academia (R4, tab 34 at 024985).

---

[14] In *Cubic Defense Applications*, we refer to the 807 Committee as the "Technical Data Advisory Committee." 18-1 BCA ¶ 37,049 at 180,366. In *FlightSaftey International*, we refer to it as the "government-industry committee." ASBCA No. 62659, slip op. at 30. To the extent there is a question as to whether the Board may look to the 807 Committee report in interpreting the 1995 DFARS provisions, *see The Boeing Co.*, ASBCA No. 60373, 20-1 BCA ¶ 37,629 at 182,684 n.3; *but see FlightSafety Internat'l, Inc.*, ASBCA No. 62659, slip op. at 30-31; *Cubic Def. Applications, Inc.*, 18-1 BCA ¶ 37,049 at 180,366, we note that it is the Navy who invites us to consider the report.

After holding meetings between July 1992 and December 1993, the 807 Committee issued a report containing its recommendations (R4, tab 34).  For our purposes here, the report is notable in two respects.  First, the committee recommended separate treatment for computer software, believing that separate treatment "would provide greater flexibility to deal with evolving practices" and "new statutory requirements or technological advancements that affect either technical data or computer software only or affect both to varying degrees" (R4, tab 34 at 024962-63, 024974).  *See also* 50 Fed. Reg. 31,583, 31,585 (June 20, 1994).  Accordingly, the committee proposed two separate clauses—one pertaining to rights in technical data for noncommercial items and one pertaining to rights in noncommercial computer software (R4, tab 34 at 025017, 025031).  The committee designated the former as proposed DFARS clause 252.227-7013 and the latter as proposed DFARS clause 252.227-7014 (*id.*).  Both proposed clauses included definitions of the term developed.  The definitions recommended by the committee were adopted in the 1995 version of the -7013 and -7014 clauses.  *Compare* R4, tab 34 at 025017-18, 025032 *to* 60 Fed. Reg. 33,464, 33,490, 33,493-94 (June 28, 1995) (codified, as amended, DFARS 252.227-7013(a)(6) and DFARS 252.227-7014(a)(6)).

The second reason the report is notable is because it reflects that the 807 Committee was aware of and declined to incorporate the patent law concept of actual reduction to practice when defining the term developed.  The report shows that, for the purposes of technical data, the committee debated whether the definition should include a requirement for reduction to practice, with developers' representatives advocating to eliminate the patent law test and non-developers' representatives advocating to adopt it (R4, tab 34 at 024966-67).  Ultimately, the committee chose not to include such a requirement.  (*Id.* at 025017) ("To be considered 'developed,' the item, component, or process need not be . . . actually reduced to practice within the meaning of Title 35 of the United States Code.")  Instead, as explained in the report, the committee opted for a definition that included concepts such as existence and workability (*id.* at 024967).

For the purposes of computer software and programs, it does not appear that representatives proposed the patent law test for consideration (*id.* at 024977-78).  Instead, the 807 Committee's debate centered around whether computer software should be considered developed when the initial flow diagrams had been constructed or whether the software should be subject to a workability test (*id.*).  From this we can deduce that, although representatives were well aware of the concept, none proposed the patent law concept for computer software or programs.  Rather, as explained in the report, the committee opted for a definition that included sufficient testing and analysis

for computer software and successful operation in a computer for computer programs (*id.* at 024978).[15]

In June 1994, DoD published a proposed rule expressly adopting the recommendations of the 807 Committee, 59 Fed. Reg. 31,584 (June 20, 1994), and, the following year, DoD issued the final rule, 60 Fed. Reg. 33,464 (June 28, 1995). Importantly, adopting the recommendation of the 807 Committee, the 1995 regulations marked the first time that technical data and computer software were treated separately. Further, as explained above, the definitions of developed proposed by the 807 Committee were incorporated into the DFARS provisions. To reiterate, neither definition includes a requirement to demonstrate actual reduction to practice and, in fact, the definition set forth in the -7013 clause expressly excludes the requirement. DFARS 252.227-7013(a)(6) ("To be considered "developed," the item, component, or process need not be at the stage where it could be offered for sale or sold on the commercial market, *nor must the item, component, or process be actually reduced to practice within the meaning of Title 35 of the United States Code*.") (emphasis added).

In short, the 807 Committee—like the ASPR Committee discussed in our decision in *Bell Helicopter Textron*—was familiar with the patent law concept of actual reduction to practice and its potential application to the area of license rights in

---

[15] At the time the 807 Committee met, the law regarding the patentability of computer software and programs was uncertain, given that the U.S. Patent and Trademark Office, the Federal Circuit, and the Supreme Court had resisted treating computer software and programs as patentable subject matter. *Gottschalk v. Benson*, 409 U.S. 63, 72-73 (1972) (rejecting patentability of digital computer program and noting that such patents are typically "rejected on the ground of nonstatutory subject matter") (internal citation and quotation omitted); *Parker v. Flook*, 437 U.S. 584, 594-95 (1978) (noting that "[t]he youth of the industry may explain the complete absence of precedent supporting patentability" of computer programs); *Diamond v. Diehr*, 450 U.S. 175, 187-88 (1981) (concluding that "the process as a whole does not thereby become unpatentable subject matter" because there is "computer use incorporated in the process patent"). It was not until 1994 (after the 807 Committee met and issued its report) that the Federal Circuit brought some certainty to the patentability of computer software and programs. *In re Alappat*, 33 F.3d 1526, 1545 (Fed. Cir. 1994) (*en banc*) (holding that "a computer operating pursuant to software *may* represent patentable subject matter, provided, of course, that the claimed subject matter meets all of the other requirements of Title 35"), *abrogated on other grounds by In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (*en banc*), *aff'd sub nom. Bilski v. Kappos*, 561 U.S. 593 (2010). Thus, the 807 Committee's silence on using patent terminology regarding computer software and programs arguably makes sense.

technical data and computer software.  Despite this familiarity, the drafters of the -7014 clause choose not to adopt language such as "developed to the point of actual reduction to practice" as the criterion for establishing that computer software and programs were developed, which they easily could have done.  Accordingly, we conclude that the drafters acted purposely in excluding such language from the definition of developed and we decline to require such showing.  *See, e.g., Sistek v. Dep't of Veterans Affairs*, 955 F.3d 948, 954 (Fed. Cir. 2020) (declining to add "retaliatory investigations" to the list of qualifying personnel actions under the Whistleblower Protection Act where the Federal Circuit found that Congress was aware of such investigations and, despite this knowledge, expressly declined to add such investigations to the statute); *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353, 1362 (Fed. Cir. 2008) (declining to interpret the safe harbor provisions of 35 U.S.C. § 121 to include continuation-in-part applications where the Federal Circuit found that Congress was aware of such applications and could have explicitly included them in the statutory language, but did not do so); *Ammex, Inc. v. United States*, 52 Fed. Cl. 303, 312 (2002) (declining to interpret "duty-free operator" in 19 U.S.C. § 1955 as including "exporters" where the court found the drafters of the statute were aware of the term and chose not to include it in the statute).

As a final point, we note that, although the Navy discusses the 807 Committee report in detail, the Navy once again fails to address or acknowledge language in the report that undercuts its argument.

### c. The *Expressio Unius* Canon of Construction Does Not Alter Our Analysis.

The Navy's final argument for including the patent law test relies on the canon of construction known as *expressio unius est exclusio alterius.*  Noting that the -7013 clause pertaining to technical data explicitly rejects a reduction to practice test, whereas the -7014 clause pertaining to computer software is silent on the matter, the Navy urges us to interpret this silence as evidence that the drafters intended to mandate such a test for computer software (gov't mot. at 30-31 n.8; gov't reply at 11-13).  This argument is not persuasive for several reasons, not the least of which is that the canon simply does not apply in this context.

The canon of *expressio unis* stands for the proposition that "the expression of one thing is the exclusion of the other." *Elkem Metals Co. v. United States*, 468 F.3d 795, 801 (Fed. Cir. 2006) (citation omitted).  The canon does not apply to every statutory listing or grouping; the canon applies only when the statute identifies "a series of two or more terms or things that should be understood to go hand in hand," thus raising the "sensible inference that the term left out must have been meant to be excluded." *Chevron U.S.A. Inc. v. Echanzabal*, 536 U.S. 73, 81 (2002).  In sum, the canon is used to support the argument that when one or more things of a class are

22

expressly mentioned, others of the same class are excluded.  The Navy, however, does not rely on the canon to advance the argument that items of the same class were intentionally excluded.  Rather, the Navy relies on the canon to argue that we should include language that was omitted, which is simply not the law as discussed above.

We find the more appropriate cannon of construction to be the canon of *casus omissus pro omisso habendeus est*, under which a statute or regulation should not be read to include matter it does not include.  *See e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (rejecting construction that "would have us read an absent word into the statute" because it "would result not in a construction of the statute, but, in effect, an enlargement of it by the court" (citing *Iselin v. United States*, 270 U.S. 245, 251 (1926) (cleaned up)); *Mamani v. Berzain*, 825 F.3d 1304, 1310 (11th Cir. 2016) (noting that the court is not "allowed to add or subtract words from a statute" that may better serve a certain policy and underscoring that a court's "task is merely to apply statutory language, not to rewrite it").  We decline here to insert words or tests that the drafters of the -7014 clause did not include.

In conclusion, based upon the plain language of the -7014 clause, as further supported by our decision in *Bell Helicopter Textron* and the regulatory history, we conclude that a contractor need not show actual reduction to practice to demonstrate that computer software is developed, as that term is defined in the -7014 clause.

B. The Navy Fails to Establish that a Corroboration Requirement Is Necessary in the Context of Software Rights.

As stated above, the Navy's argument for a heightened standard of review fails for another reason.  Even assuming that we were to rely on the patent law concept of reduction to practice to define the term developed, the Navy does not persuade us that we should adopt the attendant corroboration requirement imposed in patent priority disputes.

The corroboration requirement imposes a heavy burden of proof, requiring that an inventor's self-serving testimony be corroborated before it can be considered. *Medichem, S.A.*, 437 F.3d at 1169-70 (Fed. Cir. 2006).[16]  In the context of such

---

[16] The corroboration requirement has most often been applied in post-trial judgments.  *See e.g., Medichem, S.A.*, 437 F.3d 1157; *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69 (Ct. Cl. 1977).  Contrary to LM Aero's assertions (app. opp'n at 85 n.10), however, the requirement also has been applied at the summary judgment stage.  *See e.g., Hahn v. Wong*, 892 F.2d 1028 (Fed. Cir. 1989); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, No. 14-03103, 2017 WL 1555881 (D. Minn. Mar. 29, 2017).

disputes, the corroboration requirement exists to prevent inventors from perpetrating fraud. The Federal Circuit explains the rationale for the requirement, as follows:

> Credibility concerns undergird the corroboration requirement, the purpose of which is to prevent fraud. As such, the corroboration requirement provides an additional safeguard against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony.

*Id.* at 1170; *Chen v. Bouchard*, 347 F.3d 1299, 1309 (Fed. Cir. 2003) ("[T]he purpose of corroboration . . . is to prevent fraud, by providing independent confirmation of the inventor's testimony.") (internal quotations omitted); *Hahn v. Wong*, 892 F.2d 1028, 1033 (Fed. Cir. 1989) ("The purpose of the rule requiring corroboration is to prevent fraud.") (quoting *Barry v. Webb*, 412 F.2d 261, 267 (CCPA 1979)). *See also Baychar, Inc. v. Burton Corp.*, No. 04-144, 2006 WL 2162314 at *6 (D. Me. July 28, 2006) ("[T]he corroboration rule has been applied to prevent an inventor from relying on self-serving testimony alone to maintain an existing patent."). The Federal Circuit has further explained that "[o]nly the inventor's testimony requires corroboration before it can be considered." *Medichem, S.A.*, 437 F.3d at 1169-70 (quoting *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993)).

In the context of patent priority disputes, where an inventor-declarant stands to gain personally, the corroboration requirement provides a logical safeguard. The Navy does not convince us that such a safeguard is necessary here. LM Aero relies on declarations from the software engineers, project leads, and system architects responsible for developing and testing the software. The Navy does not claim, let alone establish, that these individuals stand to gain personally from their testimony. We decline to extend the requirement to the matter before us. Rather, we reserve for trial our judgments regarding the credibility and reliability of the testimonial evidence. *Conquistador Dorado Joint Venture*, 20-1 BCA ¶ 37,628 at 182,678 (citing *Liberty Lobby*, 477 U.S. at 255) (judges are not to weigh evidence or to make credibility determinations in deciding summary judgment motions).

VI.  The Navy Has Failed to Demonstrate that It Is Entitled to Judgment as a Matter of Law.

As a final matter, even assuming for the sake of argument that LM Aero has failed to show that the software items are developed, we are not persuaded that the Navy is entitled to judgment as a matter of law. Summary judgment is appropriate only if there is no genuine dispute as to any material fact, *and* the moving party is entitled to judgment as a matter of law. Here, the Navy does not sufficiently address,

24

let alone establish, that it is entitled to summary judgment even were the Board to rule in its favor on the question of development.

The Navy contends, in passing and without citation to any authority, that, if the software does not meet the definition of developed, then LM Aero's asserted restrictions are invalid and the government may hire another contractor to complete the development of the software. (Gov't mot. at 2) ("Without . . . proof [that its software is 'developed'], the restrictions are not only invalid, they are unjust in that they prevent the government from hiring another contractor to complete the development of this software, thus hindering and adversely impacting [the] government's ability to manage the F-35 program"). (*See also id.* at 30-31; gov't reply at 32) The Navy's legal theory appears to be that the government is entitled to less restrictive license rights (*i.e.*, government purpose rights or unlimited rights) in noncommercial computer software provided that the software has not yet reached the point of being developed.

We note, however, that each category of rights set forth in the -7014 clause contemplates that the software in question is "developed." DFARS 252.227-7014(b)(1)(i) (stating that the government "shall have unlimited rights in computer software *developed* exclusively with Government funds") (emphasis added); DFARS 252.227-7014(b)(2)(i) (stating that the government "shall have government purpose rights in computer software *development* with mixed funding") (emphasis added); DFARS 252.227-7014(b)(3)(i) (stating that the government "shall have restricted rights in noncommercial computer software . . . *developed* exclusively at private expense") (emphasis added). Hence, contrary to the Navy's assertions, if the software is not developed, there appears to be no basis for the Navy to obtain any category of rights under the -7014 clause. To the extent the Navy is concerned that it has licensed software that cannot reasonably be expected to perform its intended purpose, it is unclear why the remedy for the failure to supply a deliverable under the contract would be a broadening of the license rights granted to the government, rather than one of the well-established contractual remedies available to the government when a contractor provides non-conforming goods or services. In any event, as the moving party, the Navy bears the burden to show that it is entitled to judgment as a matter of law. We conclude that the Navy has failed to satisfy its burden.

25

<u>CONCLUSION</u>

The Navy's motion for summary judgment is denied. An order addressing further proceedings in these appeals will follow.

Dated: December 9, 2022

ELIZABETH WITWER
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62249, 62727, Appeals of Lockheed Martin Aeronautics Company, rendered in conformance with the Board's Charter.

Dated: December 12, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals